**74 So.2d 903**

**Hugh C. ILGENFRITZ et ux.**

**v.**

**RADALEC, Inc. et al.**

No. 40989.

July 2, 1954.

Rehearing Denied Oct. 5, 1954.

Morgan, Baker & Skeels, Shreveport, for defendants-appellants.

Hargrove, Guyton, Van Hook & Hargrove, Shreveport, for plaintiffs-appellees.

MOISE, Justice.

Defendant appeals from a judgment of the district court, which—

(a) Overrules the exception of no cause or right of action;

(b) Dissolves the contract for the installation of a heating system in plaintiffs' home;

(c) Authorizes the removal of a heating system from plaintiffs' home;

(d) Renders a money judgment in favor of plaintiffs for the sum of $2,-981.70, with legal interest from May 25, 1951 until paid; and further

(e) Reserves to plaintiffs an appropriate action for the cost of removing the heating system with directions to return or tender to the defendant the heating unit and recovered materials used in the installation of the heating system.

One of the most refreshing prospects to a court of last resort is when we find reasons for judgment rendered by the trial judge with a rigid impartiality as to the facts of record. We, therefore, adopt the admirable finding of facts to be found in the trial court's reasons for judgment.

D. C. Scarborough III, a general contractor employed by plaintiffs to repair and renovate their home and authorized by plaintiffs to execute a contract for the heating of plaintiff's residence, entered into the following contract with the defendants:

"February 14, 1950

We hereby propose and agree to install in your Residence—During Remodeling

Dr. Ilgenfritz . . . At 906 Wilkinson

Shreveport . . . Louisiana

Heating and/or Air Conditioning Equipment together with accessory material:

Four Model GTI–70 Lennox 70,000 BTU Heating Units with 2 Timer Thermostats and 2 Standard Thermostats, Grilles and Ductwork as agreed between G. C. & H. C., and 1 Coleman Thermal Wall Fan.

Specifications: We purpose to install the above equipment as follows: 1. Unit furred into Dining Room/Hall partition serving hall downstairs, dining room and pantry. Kitchen served by Thermal Fan over Pantry/Kitchen Door. 1 Unit furred into study serving study.

Living Room and Bkfst. Room. 1 Unit in Hall Closet Upstairs serving upstairs hall and 2 Bedrooms. 1 unit in bedroom closet serving bedroom and glassed porch. Plumbing & Furring by G. C.

If New Construction, Purchaser agrees to furnish Electrical, Gas, and/or Water Outlets to Equipment Location and to furnish all carpentry.

Performance: We guarantee that the areas specified above will be heated and/or cooled to 72° F. when outside temperatures are not below 10° above zero F. nor above $\frac{winter}{summer}$ above zero F. providing our instructions as to care,

maintenance, and operation of the system are followed. We reserve the right to make alterations or change specifications at any time for the betterment of the system.

We guarantee said equipment, material and workmanship to be free of defects for a period of one year from the date of installation.

In consideration of our furnishing the above, you agree to the following terms:

Cash Selling Price .........$1,115.41
State Tax ...............For Resale
Total ...................$1,115.41"

During the winter season of 1949–1950, Radalec, Inc. installed the above described Lennox Heating System in plaintiffs' home. With respect to its operation and to the performance of the guarantee set forth in the contract, the work was a total failure. The trial judge found the following facts with which we are in accord:

"The heating system was first placed in operation in the Fall of 1950. During an onset of cold weather around Christmas of 1950 and January of 1951, the system failed to perform satisfactorily or in accordance with the guarantee covenant in the contract. In addition, there occurred peeling of the paint from the walls and ceilings, shrinkage of joints and moldings and shrinkage of floor boards resulting in broad and unsightly cracks. A condition of extreme stratification of air existed ranging from above 110° at ceiling level, 65° at thermostat level, to 48° on the floor level. The upstairs was overheated while the downstairs at the lower living areas, was underheated. At no time during that winter was outside temperature as low as 10° F. Atmospheric conditions within the home produced discomfort and were not conducive to the health of plaintiffs and their small children. The evidence in the case is rather voluminous, but the foregoing recital is a succinct statement of what, in our opinion, the record abundantly establishes. And that the heating system produced these conditions is equally proved.

"Upon discovery of these conditions, plaintiffs notified defendant and, also, requested of Arkansas-Louisiana Gas Company, the natural gas utility company serving Shreveport, inspection and advice by its experts in gas utilization and heating engineering, a service the Gas Company makes available to its consumers. In compliance with plaintiffs' request, Mr. M. S. Bolinger, Assistant Superintendent of Gas Distribution of the Arkansas-Louisiana Gas Company, inspected plaintiffs' home and the heating system defendant had installed therein. He advised plaintiffs that the heating system, as designed and installed by defendant, was incapable of efficiently

heating the home and in the manner called for by the contract, and, as designed and installed, it could not be made to do so. Mr. Bolinger was also of the opinion that a continued use of the heating units as installed by defendant in the upstairs of plaintiffs' home was dangerous, and ordered plaintiffs to discontinue their use, failing in which the Gas Company would disconnect its gas service to plaintiffs' home. Naturally plaintiffs complied.

"After receiving plaintiffs' complaints defendant, Radalec, Inc., through its representative, inspected plaintiffs' home and the heating system. Defendant, through its President, Mr. Herman Meyer, suggested that it be permitted to make two changes to improve the system, which proposals plaintiffs considered, in the light of the advice they had received, to be impractical and inutile. Plaintiffs refused to permit the suggested changes and demanded that defendant remove the heating system, restore their home to the same condition it was in before installation, and return the money plaintiffs paid defendant and the contractor. Upon defendant's refusal, plaintiffs filed this suit against Radalec, Inc. and Lennox Furnace Company, a foreign corporation manufacturing the heating units.

"An exception of no cause or right of action filed by Lennox Furnace Company was sustained and the suit dismissed as to that defendant.

"Defendant Radalec, Inc., filed an exception of no cause or right of action which was, by consent of counsel referred to the merits, and the case was thereafter tried. * * *"

" * * * We agree with counsel for plaintiffs in this case. We find from the evidence that the default of the defendant was not a partial default but a complete and entire nonperformance of the contract so as to defeat entirely the object of the contract. We further find from the evidence that as designed and installed by defendants, the heating system not only failed to meet the object of the contract but that it is incapable of so doing. We further find from the evidence that the suggested changes in the system proposed to be made by defendant would accomplish nothing. Our findings of fact in this respect are based primarily upon the testimony of Mr. M. S. Bolinger, which is in the record, and to discuss which in detail would extend this opinion to unnecessary length. * * * We find no evidence in the case which in our opinion is proof to the contrary of Mr. Bolinger's conclusions which we have accepted."

The defendant urged that the defects were partial and he has cited authorities to sustain his view; but, the undisputed

fact is that in order to make this heating system live up to the performance of the guarantee made, there must be installed different sizes of units, different appliances and a different location of installation in the house. This would virtually necessitate the installation of a new heating system, as the present one is completely defective. Naturally, when applied to the facts of the instant case, the authorities cited do not apply.

The following question was propounded to Mr. Bolinger, a highly regarded expert:

"Q. Is it your opinion that this particular system, properly installed, would heat the home satisfactorily?

"A. Not without some different changes, some different sizes of units and different appliances; different locations it sure could not be done."

Mr. Bolinger further testified:

"Q. Let us see if we can sum it up now; based on your tests and your experience, do the units specified in this contract, which you have just examined, heat the areas specified to seventy-two degrees Fahrenheit, or are they capable of doing so?

"A. I could not get them to do it when I was there, no, sir.

"Q. Do you think they would ever be capable of doing it?

"A. No, sir, I don't think they ever would."

In his brief the appellant contends that the district court was in error—

(a) In awarding plaintiffs damages to an amount equal to what they paid out to the defendant;

(b) Plus damages in the amount they will be required to pay to restore the status quo of the property; and

(c) That the law does not allow such decrees as a remedy in a suit for damages because of a breach of a building contract.

We do not share defendant's view, because Article 2769 of the LSA–Civil Code provides:

"If an undertaker fails to do the work he has contracted to do, or if he does not execute it in the manner and at the time he has agreed to do it, he shall be liable in damages for the losses that may ensue from his noncompliance with his contract."

In the recent case of Montague v. Milan, La.App., 67 So.2d 351, 354, the Court held:

"However, when the contractual work fails to measure up to the specifications of the contract and nothing can effectually remedy the existing condition and the owner is forced thereby to make alterations in his plans in order to acquire a useable structure, he is not obligated to settle with the contractor in conformity with the doctrine of 'substantial compliance', unless he desires to use whatever the contractor

has created. To elucidate, in such a situation the owner may say to the contractor that nothing that he may do will produce the building which was contemplated in the plans, and that, therefore, the contractor will be required to entirely remove what he has erected. On the other hand, the owner may say (or so act) to the contractor that what he had erected is not the structure which was designed, but that, the owner, nevertheless, by effecting changes in his plans, can use what the builder has constructed. If he decides to follow this alternative, he is liable to the contractor for what has been erected, less the amount it may cost him to secure a useable building, even though the construction is not such as was contemplated by the plans. * * "

■ The standard measure of damages is established by the Code as the losses ensuing from non-compliance. It is shown in this case that the losses sustained is the payment for a useless heating system and its installation, the cost of removing that useless heating system, and the cost of restoring plaintiffs' home to its former condition. These are all losses under the contract. Defendant is liable for those losses. In fact, there should be compensation up to and to the extent for the losses actually sustained in this case amounting to restoration of the status quo:

Article 1928 of the LSA–Civil Code reads:

"The obligee may require that anything which has been done in violation of a contract, may be undone, if the nature of the cause will permit, and that things be restored to the situation in which they were before the act complained of was done, and the court may order this to be effected by its officers, or authorize the injured party to do it himself at the expense of the other, and may also add damages, if the justice of the case require it."

■ The trial court properly found that the law and the evidence was in favor of the plaintiffs, and for these reasons the judgment of the district court will be affirmed.

Judgment affirmed.