JERRIE ICE COMPANY et al., Plaintiffs,

v.

COL–FLAKE CORPORATION and The Travelers Indemnity Company, Defendants.

No. 7300.

United States District Court
E. D. Louisiana,
New Orleans Division.

May 27, 1959.

Cicero C. Sessions, Gerald P. Fedoroff, New Orleans, La., Diaz & Serpas, Edward T. Diaz, Golden Meadow, La., for plaintiffs.

Stiefel, Greenberg, Burns & Baldridge, Chicago, Ill., Chaffe, McCall, Phillips, Burke & Hopkins, Leon Sarpy, New Orleans, La., for defendants.

WRIGHT, District Judge.

The plaintiffs, members of a partnership doing business as The Jerrie Ice Company, brought this action against the Col-Flake Corporation and its surety, Travelers Indemnity Company, for damages for breach of a construction contract to build a flake ice plant. Plaintiffs claim that the ice plant, as completed, is deficient in several respects, particularly the capacity of the ice storage bin. Col-Flake, asserting that the ice plant has been constructed in accordance with the contract, has counterclaimed for $75,000, the balance due on the contract price.

On May 4, 1956 a written contract was executed between plaintiffs and Col-Flake, with Travelers Indemnity as surety, whereby Col-Flake bound itself to construct an ice plant on plaintiffs' land on the banks of Bayou Lafourche near Galiano, Louisiana. The contract, as well as the plans and specifications made part thereof, were prepared by Col-Flake. With reference to the ice storage bin, the contract provided "one 200 ton

ice storage capacity, bin; built in accordance with accepted plans attached." The plans, made part of the contract, showed a storage bin, marked "200 ton ice storage," with dimensions 65 feet in length by 18 feet in width by 10 feet in height and specifying 8 feet maximum height of ice.

The contract also provided for an ice leveling device installed under the ceiling of the storage bin to spread the ice forward in the storage bin away from the four ice makers installed on the second floor of the bin toward the rear. In addition, the contract provided for a conveyor system for unloading ice from the storage bin at a minimum rate of one ton per minute. The four ice machines, according to the contract, were to produce 60 tons of ice per day. The contract also provided that on receiving the contractor's notice of completion of the work, the owner would have ten days to notify contractor of any defects, otherwise the contract would be deemed accepted. The contract further provided, however, that the acceptance by the owner "in no way lessening the responsibility of said contractor." [1]

In January 1957 the plant was ready for test operation. Various mechanical deficiencies were disclosed and corrected. The leveling device had to be replaced and the conveyor system changed to some extent. As replaced, the leveling device extended three feet below the ceiling of the storage bin, leaving a maximum height in the bin of only seven feet for ice storage instead of eight feet as specified in the plan.

Despite further mechanical difficulties reasonably to be anticipated, on March 1, 1957, after giving away ice manufactured during the test period, plaintiffs began the sale of ice from the plant, primarily to shrimp boats. On March 4, 1957, Col-Flake by letter notified plaintiffs of completion of the contract. Plaintiffs denied receiving the letter notice, and consequently made no complaints of defects in construction within the ten days specified in the contract. The plant, however, did not perform to their satisfaction. The mechanical breakdowns continued. Rust from the chain on the leveling system polluted the ice as it lay in the storage bin. The chains on the conveyor system scraped Thermocon [2] from the floor, further polluting the ice. The cross conveyor which brought the ice from the conveyors on each side of the storage bin to a hopper device outside, from which it was loaded into shrimp boats, continually broke down. According to the plaintiffs, even when the cross conveyor worked, it did not remove one ton of ice per minute from the storage bin as required by the contract.

Plaintiffs' complaints to Col-Flake about the operation of the plant continued through most of 1957 and Col-Flake continued to send repair personnel to the plant. Finally, plaintiffs brought consulting engineers of their own into

---

1. Article V of the contract reads, in pertinent part, as follows:

"Upon completion of this contract the Contractor will notify Owner in writing that the work is complete. Owner shall then have ten days within which to sign an acceptance, provided that if Owner finds any conditions to exist that are not satisfactory that Owner will notify Contractor within ten days of said defects. At the expiration of said ten day period if no objections are submitted by owner the contract will be deemed accepted under the terms and conditions of this contract.

"Said written acceptance by Owner, however, in no way lessening the responsibility of said Contractor, neither shall it exempt the said Contractor from liability to replace work within the manufacturer's standard and published warranty and quantity if it be afterwards discovered to have been improperly done or not according to the plans or specifications, either in execution, equipment or materials; * * *."

2. Thermocon is a lightweight concrete material having insulating properties. The four walls of the bin, as well as the floor and ceiling, were composed of this material.

the plant who advised that, among other deficiencies, the capacity of the storage bin was less than 120 tons. After fruitless attempts by the parties, with their lawyers, to settle their differences, this suit was filed on November 26, 1957.

The plaintiffs contend that the ice plant has not been built according to specifications, that the plant machinery is defective and below stipulated production capacity, that the conveyor system does not work properly, that the leveling device, as well as the conveyor system, dirties the ice, making it unpotable and unsalable, that the capacity of the ice storage bin is substantially less than 200 tons, and that there is no way the plant can be brought into compliance with the contract and plans and specifications made part thereof. Relying on Article 1928 [3] of the LSA–Revised Civil Code, and the Louisiana decisions [4] interpreting that article, plaintiffs demand that "things be restored to the situation in which they were" before the contract was let, that Col-Flake be required to remove the plant from plaintiffs' premises, return the $25,000 down payment on the contract price, and pay damages, not only to cover those sums otherwise invested by plaintiffs in the ice plant operation, but also for loss of profits which would have been realized by the partnership had the plant operated as per contract. In the alternative, relying on Article 2769 [5] of the LSA–Civil Code, plaintiffs demand a diminution in the contract price by reason of the deficiency in performance.

Col-Flake begins by making several legal defenses. It first says that the failure of plaintiffs formally to complain of the defects in the plant within ten days after notice of completion estops them from denying completion and forecloses them from asserting any defenses based on noncompliance with the contract. Col-Flake also asserts it was not placed in default by plaintiff before suit was brought as required by Louisiana law.[6]

Moving to the merits, Col-Flake asserts that the plant has been completed in strict compliance with the contract, that the mechanical breakdowns in the plant and deficiencies in ice production result directly from lack of proper maintenance of the plant facilities, and that the rust and other foreign matter which finds its way into the ice is attributable to the failure of the plaintiffs properly to clean the plant and its equipment, particularly that part of the plant where the conveyor chain scrapes on the Thermocon slab which serves as its foundation.

■ With respect to the claim that the ice storage bin does not have a capacity of 200 tons as required by the contract, Col-Flake says that the dimensions of the bin are in fact in excess of those required by the contract. It states further that if the entire bin were filled to its four walls with ice, the capacity would be in excess of 200 tons. It admits, however, that as far as the

3. Article 1928 of the LSA–Civil Code reads:
"The obligee may require that any thing which has been done in violation of a contract, may be undone, if the nature of the cause will permit, and that things be restored to the situation in which they were before the act complained of was done, and the court may order this to be effected by its officers, or authorize the injured party to do it himself at the expense of the other, and may also add damages, if the justice of the case require it."

4. Ilgenfritz v. Radalec, Inc., 226 La. 59, 74 So.2d 903; National Water-Purifying Co. v. New Orleans Waterworks Co., 48 La.Ann. 773, 19 So. 865; Montague v. Milan, La.App., 67 So.2d 351; Home Services v. Marvin, La.App., 37 So.2d 413.

5. Article 2769 of the LSA–Civil Code reads:
"If an undertaker fails to do the work he has contracted to do, or if he does not execute it in the manner and at the time he has agreed to do it, he shall be liable in damages for the losses that may ensue from his non-compliance with his contract."

6. Defendants cite LSA–C.C. art. 1933 and Steel Const. Co. v. Louisiana Highway Commission, D.C., 60 F.Supp. 183.

practical operation of the ice plant is concerned, the storage bin does not have a capacity of 200 tons because the height of ice in the 10-foot-high bin can only be seven feet since the leveling device projects down from the ceiling three feet. It suggests that this leveling device could be recessed as much as 18 inches so that it would project from the ceiling 18 inches. If this were done, while the capacity of the bin would be increased, admittedly it would still be substantially less than 200 tons.

This was the first ice plant built by the Col-Flake Corporation which, for many years, has been a manufacturer of ice machines. As might be expected, this lack of experience resulted in construction problems not anticipated. It also resulted in a substantial miscalculation as to the capacity of the ice storage bin. While Col-Flake has succeeded in overcoming most of these unanticipated problems, it has made no effort, other than the suggestion that the leveling device be recessed 18 inches, to comply with the requirement of the contract as to storage capacity.

Complying with the contract in this regard would require a substantial outlay of money, but that fact cannot relieve Col-Flake of its responsibility under the contract. The plaintiffs here are two uneducated former fishermen who decided to venture into the ice business. Col-Flake wrote the contract between the parties and drew the plans and specifications. Those documents show as clearly as words can that the capacity of the bin is 200 tons. Col-Flake admits that it would be impossible to place 200 tons of flake ice in the bin and operate the plant. The fact that there is unusable space in the bin above the leveling device cannot relieve Col-Flake of its obligations to supply usable space sufficient to store 200 tons of flake ice.

■ Plaintiffs' other complaints are not well founded. They stem primarily from the fact that the plaintiffs used in-

experienced personnel to operate and maintain the plant. An ice plant capable of producing 60 tons per day contains substantial electrical and mechanical equipment requiring the care of a trained engineer. Instead of trained personnel, plaintiffs used ex-fishermen whose only prior mechanical experience was making repairs to engines in shrimp boats. It was this lack of care which was primarily responsible for the frequent breakdowns of the compressors, the excessive oil in the ice machines which reduced their output below prescribed capacity and damaged the blades.

With reference to the pollution of the ice, this problem also can be overcome by proper maintenance. First of all, simply hosing under the conveyor system daily would eliminate the excess of Thermocon which is scraped into the ice by the conveyor chains. Moreover, the worn angle iron used to protect the conveyor chain from the Thermocon could be replaced and the problem thus eliminated altogether. With reference to the rust from the leveling device chains, proper care of those chains, such as galvanizing or painting, would eliminate the rust. It appears from the evidence that the plaintiffs have deliberately allowed the plant to run down through lack of maintenance in anticipation of the trial of this case.

■ The law with reference to compliance with construction contracts in Louisiana is fairly clear. In fact, it seems to be the only area in which the parties find themselves in agreement. In interpreting the relevant articles [7] of the Louisiana Civil Code, the courts of Louisiana have outlined what has come to be known as the doctrine of substantial performance. Under this doctrine, where the contractor has substantially performed the contract, he is entitled to sue for the contract price, the burden of proving damage resulting from failure of the contractor to perform to the letter of the contract being on the owner.[8] Under this doctrine the con-

7. LSA–C.C. Arts. 2769 and 1928. See Notes 3 and 5.

8. See Town & Country Contractors v. Henderson, 231 La. 131, 90 So.2d 863; Wick-

tractor is entitled to full payment minus the amount required to bring the building in complete compliance with the contract. Substantial performance is said to exist when the object of the contract may be used for the purpose intended but there nevertheless exist certain defects or omissions in construction. If the object, however, cannot be used for the purpose intended because of failure to comply with the provisions of the contract, the doctrine of substantial performance does not apply. In that circumstance, the owner may require the contractor to remove the object from his land and restore the premises to their prior condition. In addition, the owner is entitled to damages.[9]

■ The primary consideration here, therefore, is whether the doctrine of substantial performance can be applied. Will the ends of justice be served by requiring the plaintiffs to keep the plant, allowing them a diminution of the purchase price for the deficiency in construction? Or should the contractor be required to remove the plant, return the down payment and pay damages to the plaintiffs? It is unquestioned that every item of equipment required under the contract was placed in the plant by Col-Flake. The only deficiency in construction, the only failure to perform relates to the size of the storage bin. Unquestionably, this is a serious deficiency. Shrimp boats go out all at one time; consequently they need ice all at one time. Without sufficient storage capacity, there may be occasions where the plaintiffs will not be able to meet the demand for ice. On the other hand, the plant has been used by the plaintiffs for two years, producing ice and serving customers. The occasions when the plant was unable to meet the demand for ice during this period were few and far between. In good conscience,

it would be wrong to require the defendant to tear down and remove this entire plant merely because of lack of contract storage capacity. This is precisely the kind of situation contemplated by the doctrine of substantial performance. It is an equitable doctrine developed by the Louisiana courts as a gloss on the articles of the Louisiana Civil Code.[10] It is the doctrine which must be applied here.

■ Estimating the cost of increasing the capacity of the storage bin to contract requirements presents a difficult problem. Plaintiffs' evidence suggests the storage bin cannot be increased without tearing it down and starting over. One of the plaintiffs' experts, however, alternatively suggests the possibility that the compressors, which are on the main floor of the storage bin toward the rear, can be moved to the second floor alongside the ice machines, thus making available considerable extra space for the storage of ice. A study of the plans of the storage bin shows this solution to be feasible. There has been no credible estimate, however, as to the cost of this work. Considering the total cost of the contract, as well as the testimony of all of the witnesses bearing on the cost of making this and other changes in the plant, this Court estimates the cost of removing the compressors from the first to the second floor of the bin to be $25,000. This amount, therefore, should be subtracted from the balance on the purchase price owed Col-Flake. In addition, there is owed Col-Flake $1,750 for the written change order covering the Thermocon installation. Col-Flake's additional demand for $2,200 for louvre installations is denied for the reason that that change, later discarded, was not in writing as required by the contract.

liffe v. Cooper & Sperier, 167 La. 689, 120 So. 52; Jones v. Tusa, La.App., 100 So.2d 799; Lillis v. Anderson, La.App., 21 So.2d 389; Cairy v. Randolph, 6 La. Ann. 202. See also Building Contracts in Louisiana, 7 La.L.Rev. 564.

9. Ilgenfritz v. Radalec, Inc., supra; National Water-Purifying Co. v. New Orleans Waterworks Co., 48 La.Ann. 773, 19 So. 865; Montague v. Milan, supra; Home Services v. Marvin, supra.

10. See Note 7.

There remains for disposition the two legal defenses raised by Col-Flake. First, Col-Flake's claim that the plaintiffs are estopped from claiming defects in the plant because they failed within ten days after notice of completion to advise the contractor of those defects is obviously without merit. This claim is predicated on a provision in the contract which states, "At the expiration of said ten day period if no objections are submitted by owner the contract will be deemed accepted under the terms and conditions of this contract." But the very next sentence in the contract begins: "Said written acceptance by Owner, however, in no way lessening the responsibility of said Contractor, * * *." Moreover, the lack of bin storage capacity was not disclosed until several months after Col-Flake's notice of completion.[11]

The defense of failure to place in default is equally untenable.[12] Here there was an active breach of the contract by Col-Flake and consequently no putting in default was required.[13]

The reciprocal demands for attorney's fees are denied.

Judgment accordingly.

11. See Michel v. Efferson, 223 La. 136, 65 So.2d 115; Kozlowski v. Fowler, La. App., 71 So.2d 246.

12. This defense is based on LSA–C.C. art. 1933 which, in pertinent part, reads:
"When the breach has been passive only, damages are due from the time that the debtor has been put in default, in the manner directed in this chapter." Compare LSA–C.C. art. 1932 which reads:
"When there is an active violation of the contract, damages are due from the moment the act of contravention has been done, and the creditor is under no obligation to put the debtor in default, in order to entitle him to his action."

13. Orlando v. Elmer, 236 La. 282, 107 So. 2d 641; Parkerson v. Home Protection Service, Inc., La.App., 24 So.2d 256; Levy v. M. Schwartz & Bro., 34 La.Ann. 209. In Orlando v. Elmer, supra, 107 So.2d at page 644, the Louisiana Supreme Court said:
"In this court counsel representing the defendant has, for the first time, filed ex-

ceptions of no cause and no right of action predicated on the assertion that plaintiff did not allege, and the record does not reveal, defendant was placed in default prior to the filing of the suit. These exceptions are without merit. The record not only reveals that in September and again in October of 1954 the defendant was contacted by attorneys on behalf of the plaintiff in an effort to have him complete the residence and to correct the errors in the structure, but defendant himself admitted he and the plaintiff had attempted on a number of occasions to reach an agreement in the matter. Furthermore, under the express provisions of Article 1932 of the Revised Civil Code, 'When there is an active violation of the contract, damages are due from the moment the act of contravention has been done, and the creditor is under no obligation to put the debtor in default, in order to entitle him to his action.' Such an active violation is overwhelmingly established in this case."