441 So.2d 1238 (1983)
Frank J. FORTIER, III
v.
Thomas SESSUM.
No. 83-CA-397.
Court of Appeal of Louisiana, Fifth Circuit.
November 9, 1983.
Rehearing Denied December 19, 1983.
*1239 Stassi & Rausch, Lucas J. Giordano, New Orleans, for Frank J. Fortier, III, plaintiff, defendant-in-reconvention, third-party plaintiff-appellant.
Schaff & Currier, John M. Currier, New Orleans, for Thomas Sessum, defendant, plaintiff-in-reconvention appellee.
Satterlee, Mestayer & Freeman, Henry F. Mestayer, and O'Keefe, O'Keefe & Berrigan, Wayne T. McGaw, New Orleans, for Dixie Bldg. Material Co., Inc., third-party defendant-appellee.
Before BOUTALL, CHEHARDY and GAUDIN, JJ.
CHEHARDY, Judge.
Plaintiff, Frank J. Fortier, III, filed this suit against defendant, Thomas Sessum, for $2,604.59, the amount allegedly due under an oral agreement for concrete work performed at defendant's home, and $86 to file a workmen's lien.
Defendant answered claiming the bill was unpaid because it exceeded the price agreed upon, and the work was performed in a careless and negligent manner. He reconvened for $23,600 in damages.
Plaintiff then filed a third party demand against Dixie Building Material Co., Inc., the corporation which supplied the concrete, in the event judgment was rendered against him in the reconventional demand. He also sought judgment against Dixie if the court should dismiss his claim against defendant on the main demand.
Following trial on the merits judgment was rendered dismissing plaintiff's suit on the main demand. There was judgment in the reconventional demand in favor of defendant in reconvention in the sum of $13,955.91 plus expert fees of $465, and judgment in the third party demand in favor of Dixie, dismissing the claim against it.
Plaintiff has appealed.
The record reflects the following facts:
Mr. and Mrs. Sessum were contemplating buying a hot tub and went to "Nature Spa" to view the merchandise. Fortier is the owner of that business. Sessum explained that before he could purchase the tub he would need some concrete work done. Plaintiff indicated he was also a contractor and qualified to do that work.
That evening Fortier went to the Sessum home to determine the work involved. The original plan was to top the patio area and a shed row in the rear of the property where defendant was keeping some horses, *1240 and create a walkway between the property and the shed row.
Defendant was having a drainage problem and plaintiff was to correct this; however, there is a dispute as to whether or not plaintiff guaranteed he could correct it. Defendant says plaintiff did, but plaintiff claims he only promised to do the best he could and that he could make no guarantee about the drainage.
Both parties agree the original price quoted was $1,601, but at some time prior to the date the work was to begin defendant decided to include topping the driveway area. According to defendant, plaintiff quoted an additional cost of $400, to which he agreed; according to plaintiff all of the work was to be done at cost, which amounted to $2,604.59, the sum for which he billed defendant.
The work was done in one day on May 20, 1980 by plaintiff and six workmen, with concrete supplied by Dixie. The concrete ordered was to have a load-bearing capacity of 3,000 pounds.
The following day defendant called plaintiff to complain the work was unsatisfactory. Fortier went to inspect the job. It was clear that the finish was unsatisfactory. He saw it several times the following week and attempted to correct it with muratic acid, but this was unsuccessful. Some months later it looked much worse.
Plaintiff admits it is steadily deteriorating. Rain and moisture accumulate in puddles in some areas and the water is not draining properly onto the street. The aggregate on the patio and the driveway contains loose pebbles, and there is evidence of chipping and heavy pitting in the shed row.
Everyone agrees that the results are deplorable, including plaintiff, defendant and all of the experts. Quite clearly the work is defective. Therefore, we are called upon to determine who is responsible for the damage and the amount of an award.
It is plaintiff's position that the damages result from defective concrete. It is admitted by all parties that the concrete ordered was to have a load-bearing capacity of 3,000 pounds psi. Dixie claims the concrete supplied fulfilled that requirement at the time of delivery.
The trial court found the concrete supplied was of high quality and there was no fault on the part of the supplier. In arriving at that determination it was aided by the testimony of various experts.
Plaintiff's experts were Dr. Saad Moustafa, an engineer and concrete expert on the faculty at the University of New Orleans, and Donald Maine, president of Delta Testing & Inspection Company.
Maine took four core samples some months after the pour to determine the load-bearing capacity. The concrete tested at 2,200 pounds psi. Moustafa felt the concrete was not as durable or strong as it should have been, and although part of the problem was due to poor workmanship, he concluded the deficiency in strength was responsible for the concrete's later deterioration.
We note here that defendant was not complaining about the load-bearing capacity but only about the cosmetic appearance. The consensus of all of the experts is that there is no correlation between the load-bearing capacity, which is the strength of the finished product, and the cosmetics of the finish.
Edmond Schrenk, an engineer and consultant to the construction industry, and Joseph Scheyd, president of Hammond Construction Co., testified as defendant's experts, and Charles Kuhn, director of quality control for Dixie, testified on its behalf. Arthur Brown, a concrete finisher, and Dr. Eduardo Guevera also testified as experts for Dixie.
Kuhn described for the court the manner in which concrete is made. He explained it is a perishable mixture of four basic ingredients: cement, sand, gravel and water. Everything is weighed and dropped into a truck in specific sequence. The delivery truck's tank which holds the mixture runs very slowly at two to three revolutions per minute so the concrete does not set.
*1241 The concrete is batched at the plant by computer. If the mixture goes bad, a tolerance acceptance switch is activated which stops the machine. It will not accept whatever is below or above the tolerance set.
Guevera confirmed that he had examined the batch tickets on defendant's delivery and the formula shown on the tickets would achieve 3,000 pounds psi mix. In his opinion the finisher let the concrete stay in the truck too long. The final result depends on many factors before, during and after the pour.
The experts agree that the material is perishable and must be handled properly by the concrete finisher to maintain the potential. It is up to the finisher to pour it, treat it and cure it to achieve that potential for which it was designed when it arrives at the job site.
Mr. McPherson, the plaintiff's concrete finisher, did not testify. Plaintiff himself stated he was present when the concrete arrived but he was not present during the entire finishing period. He claims to have seen his finisher spray the concrete with a hose, using a fine water mist, after it was poured. However, defendant and his wife stated the finisher used a hose with a brass nozzle and the water was coming through full force.
According to most of the experts, the gouges in the concrete were caused by a high power hose which resulted in the pebbles continuing to become dislodged and created the ugly cosmetic finish.
The trial court was impressed with the testimony of Mr. Brown, the independent paving contractor. Brown stated the job was absolutely horrible, that it was laid down wrong and should have been handled by at least eight to ten men, if done properly, and should have taken more than one day. He concluded the work had been performed by an inexperienced finisher and that too much water had been left to sit on top, thus causing the deteriorating surface.
The failure of plaintiff to call his concrete finisher, Mr. McPhearson, or explain his absence, raises the presumption that his testimony would have been unfavorable. Judice Armature Works, Inc. v. Bd. of Com'rs, Etc., 410 So.2d 368 (La.App. 4th Cir.1982).
The trial court found the problem arose when this quality product (i.e. the Dixie concrete) was turned over to plaintiff's concrete finisher who caused the problem. That finding is amply supported by the record.
Having concluded the plaintiff was at fault, the trial court dismissed his suit against defendant in the main demand and granted judgment in the reconventional demand to defendant in reconvention in the sum of $13,955.91. In reasons for judgment he itemized that award as follows:

1.The cost to test the defective
 concrete $ 447.37
2.The cost of the engineer to
 examine the job 58.39
3.The current cost to repair the job 12,900.00
4.Cost to repair broken water pipes 85.15
5.Cost of consulting engineer
 (expert) to testify 240.00
6.Cost of testing engineer (expert)
 to testify 150.00
7.Cost of contractor (expert) to
 testify 75.00
 __________
 TOTAL $13,955.91

Appellant contests all of the awards, particularly the $12,900 cost of repair, and the separate award of experts' fees in addition to those itemized above.
We agree the in globo award already includes $465 for experts' fees. Consequently the separate award of $465 for experts' fees in addition thereto is a duplication and the judgment should be reversed in that respect.
We also agree with the award of $447.37 to test the defective concrete, and that of the engineer to examine the job ($58.39). These services were necessary to determine whether or not the concrete was indeed defective, and if so, in what respect. See Wappler v. Braucht, 209 So.2d 603 (La. App. 2d Cir.1968).
The evidence further supports the award of $85.15 to repair the broken water pipes. The damage was caused by trucks which plaintiff had been warned to keep *1242 away from that area due to the location of the pipes.
Appellant's principal complaint concerns the award of $12,900 for the current cost to repair the job. This award was based principally upon the testimony of Mr. Scheyd.
Scheyd conceded the most economical way to repair the job would be to top it with rich additional concrete. However, he gave no estimate of this cost because it would not alleviate the drainage problem.
To correct the drainage problem Scheyd proposed to tear up all of the existing concrete paving, including that already in place prior to the work done under the contract in suit, and start from scratch.
His cost was based upon the estimate of April 28, 1981:
"Re: Replacement of existing concrete paving at 4808 Taft ParkwayMetairie, La.
Gentlemen:
We are pleased to quote you a lump sum price of Twelve Thousand Nine Hundred Dollars ($12,900.00) to furnish all labor, materials, equipment, supervision, taxes, and insurances to perform the work listed below as shown on the enclosed sketch.
1. Breakout and remove approximately 1900 square feet of existing concrete paving.
2. Fill and compact with sand fill under the new paving area.
3. Install approximately 1900 square feet of new 4 inch thick concrete paving reinforced with 6 × 6 10/10 mesh and all associated formwork and expansion joints.
4. Install approximately 1523 square feet of exposed aggregate topping ¾ inches thick.
5. Install fill and grade perimeter areas of new concrete paving. This price excludes grass seeding or sodding of any disturbed areas."
In analyzing the lump sum proposal Scheyd allocated $2,900 to the cost of breaking up and removing all of the existing concrete, including that pre-existing this contract. (Estimate, Item No. 1)
Five Hundred Dollars of the estimate covered the cost of sand fill and compacting that fill after the removal of the existing concrete and prior to pouring the new concrete. (Item No. 2)
We are unable to determine from Scheyd's testimony the cost of labor and materials to install the 1900 square feet of new concrete paving. (Item No. 3)
He testified that the cost of installing the 1,523 square feet of topping would be $1,200 (Item No. 4). This includes a different finish than that installed by appellant and is much more expensive. The new topping would be like that of a driveway across the street which appellee admires.
Finally, Scheyd would fill in areas surrounding the new concrete with sand at a cost of $198. (Item No. 5)
It is implicit in every building contract that the work of the builder is to be performed in a good workmanlike manner, free from defects in either materials or workmanship. An owner seeking to recover from the contractor has the burden of proving both the existence and nature of the defects, that the defects were due to faulty materials or workmanship and the cost of repairing the same. LSA-C.C. art. 2769; Trahan v. Broussard, 399 So.2d 782 (La.App. 3d Cir.1981); Nichols Ford Company, Inc. v. Hughes, 292 So.2d 345 (La.App. 2d Cir.1974).
Where the contractor fails to do the work he has contracted to do, or does not execute it in a manner agreed to he is liable in damages for losses that may ensue from his noncompliance with the contract. C.C. art. 2769.
In awarding plaintiff the $12,900 the trial court was attempting to place appellee in the position he would have occupied had appellant properly performed under the contract.
It is appellant's position that the award of damages in the full amount of the estimate is manifestly erroneous since it includes work clearly in excess of that contemplated by the contract.
*1243 We agree with that contention.
However, where the defects are such that they cannot be corrected except by removing and replacing the construction, the owner may require the contractor to remove the object from his land and restore the premises to their prior condition. Trahan v. Broussard, supra; Martin v. AAA Brick Co., Inc., 386 So.2d 987 (La.App. 3d Cir.1980); Neel v. O'Quinn, 313 So.2d 286 (La.App. 3d Cir.1975).
It will be necessary to remove all of the existing concrete, including the concrete on the property before the performance of the contract, because the experts concede that this would be cheaper than to attempt to remove only the new concrete or aggregate. It also appears that any attempt to refinish the existing concrete with more rich concrete would compound the current drainage problems, which are even worse than those existing prior to the contract.
For these reasons we approve of the $2,900 award in Item No. 1.
It will then be necessary to fill with sand and compact prior to pouring new concrete, so we would also affirm the $500 award for this item.
Appellant is then entitled to have replaced the amount of concrete which was in existence prior to his contract with appellant.
Because there is insufficient evidence in the record for us to determine the amount of concrete in place before the contract and the cost of replacing that amount, equity requires that we remand the case to the district court for the limited purpose of taking evidence on this point alone.
Appellant is not entitled to replacement of any other concrete other than that which existed prior to this contract. To do so would exceed restoring his property to its prior condition, and constitute unjust enrichment.
We also disallow the awards for the topping (Item No. 4) and for the additional sand (Item No. 5) for the same reasons.
We reject appellant's claim to be paid for the work performed, because his work was so defective as to be practically useless. Ilgenfritz v. Radalec, Inc., 226 La. 59, 74 So.2d 903 (1954).
For the reasons assigned we remand this case to the district court for the purpose of taking limited additional evidence, as indicated, and for awarding judgment not inconsistent with the views expressed.
REMANDED.