WALTER J. ROTHSCHILD, Judge.
|2Plaintiffs, Ellie and Steven Melancon, and defendant, Tri-Dyne Tele-Pier, L.L.C. (“Tri-Dyne”), appeal the trial court’s July 29, 2011 judgment awarding $39,016.50 to plaintiffs, as well as expert fees of $3,225.00 and court costs. For the following reasons, we reverse and vacate the award of $39,016.50 and we remand to the trial court for further proceedings.

FACTS AND PROCEDURAL HISTORY

The Melancons and Tri-Dyne entered into a contract for elevation work to be performed at the Melancons’ home at 2068 Camille Court in Lafitte, Louisiana. According to the Melancons, Tri-Dyne performed defective work and did not complete the work agreed upon by the parties. On May 5, 2009, the Melancons filed this lawsuit against Tri-Dyne alleging that Tri-Dyne breached the contract between the parties and that Tri-Dyne’s defective work caused them to suffer damages. On June 30, 2009, Tri-Dyne filed an Answer and Reconventional Demand, in which it generally denied the Melancons’ allegations and sought [s$9,757.46 as the remaining amount due to Tri-Dyne under the terms of the contract. Trial of this matter was held on June 20, 2011.
At trial, Joseph Sproules testified that he is the owner of Tri-Dyne, which is a foundation contractor. Mr. Sproules testified that Tri-Dyne entered into a contract with the Melancons to elevate their home for $47,016.50. According to Mr. Sproules, Tri-Dyne purchased additional 6 by 6 sill beams for the property for $2,550.00, making the total amount of the project $49,566.50. A set of plans for the project were prepared by Edmond Pepper of the engineering firm, Pepper and Associates, Inc. In his testimony, Mr. Sproules acknowledged that some defects were present, but he contended that all of the deficiencies could be repaired and that the Melancons did not give Tri-Dyne the opportunity to repair the problems complained of.
*578 Mr. Sproules testified that the contract between the parties was signed in the beginning of May 2007 and work began in June 2007. Shortly thereafter, the Melan-cons met with Mr. Sproules because they had an issue with the workmanship and procedures used by the subcontractor who was building the footings, Jericho Foundation. Mr. Sproules appeared at the site and instructed Jericho on how to build the forms correctly. Work on the project continued thereafter.
Mr. Sproules testified that he was at the property within six or seven months before trial and he discovered that the foundation was not constructed as per the plans drawn by Mr. Pepper, because the footings and the piers in one section were not put in. He also admitted that the plans call for six north-to-south chain walls, but only five were installed because there was “cribbing”[1] where a beam should be. Mr. Sproules testified that he informed the Melancons that the sixth beam could not be poured and told them to let him know if there were any problems with the | ¿structure so that he could make the necessary adjustments. He asserted that the Melancons did not tell him that there was any floor deflection caused by the missing beam.
Mr. Sproules admitted that there were some other deviations from the plans and that he did not consult the engineer who prepared the plans before making the changes. However, he testified that plans have to be modified somewhat during a project. Mr. Sproules believes that TriDyne completed the project, with the exception of one grade beam that should be installed.
The Melancons made an initial payment of $30,000.00 for the project. Mr. Sproules stated that the Melancons continued to make payments of $500 per month to TriDyne for 18 months after Tri-Dyne left the job site and never made any complaints about the foundation during that time. The Melancons stopped making payments in March 2009 and Tri-Dyne contends that the remaining due under the contract is $9,757.46.
Prior to trial, Mr. Sproules and Mr. Pepper inspected the property and noted some deficiencies in the construction. TriDyne’s estimate of the cost to repair the defects is $5,059.85.
Steven Melancon testified that after Hurricane Katrina, he and his wife hired Tri-Dyne to elevate their home. In his testimony, Mr. Melancon complained that the project was never completed and that there were numerous defects in the work performed. He stated that he was told that the house would be raised one time, but he contends that it was actually raised five times. Mr. Melancon testified that he met with Mr. Sproules on June 11, 2007, shortly after work on the project began, because he was not satisfied with the work of a subcontractor, Jericho Foundation. He stated that Jericho’s workers were slow, did not always show up, and the forms they prepared were flimsy. He further testified that Jericho’s workers did not even 1¡¡have a copy of the plans for the project, so he gave them a copy. He stated that when Mr. Sproules came to the site, he had Jericho tear out the foundation work they had done.
During his testimony, Mr. Melancon identified pictures of the property and defects in the work, including a gap between the chain wall and webbing, a cracked pier, a repaired pier, and other damage. Mr. *579 Melancon also stated that he was inside the house one time when it was raised and the sunroom was not raised with the rest of the house, causing the floor to separate and an exterior wall to pull away. According to Mr. Melancon, he informed Mr. Sproules of the problems caused by failing to raise the sunroom, but Mr. Sproules did not try to remedy the problem. He stated that he and his wife paid $4,400 to have some repairs made, such as sheetrock repair and having doors replaced.
Mr. Melancon further testified that he was initially informed by Tri-Dyne that the project would take 14 days to complete, but he contends that Tri-Dyne has never completed the project. He stated that there is floor deflection in the area where the sill was left out and that the furniture moves when anyone walks across that area of the floor. Mr. Melancon admitted that he did not notify Mr. Sproules in writing or otherwise about the floor deflection, because Mr. Sproules had ignored other issues that were brought to his attention.
Elbe Melancon testified that she was at home when the house was raised five times and when the sunroom was not raised with the rest of the house. She stated that after the initial payments to Tri-Dyne, they paid $500.00 per month because they were waiting on funds from the Road Home program. Mrs. Melancon testified that Tri-Dyne did not complete the elevation project, did not follow the plans, and took out a support beam without replacing it.
| fiPressley Campbell, a structural engineer, testified on behalf of the Melancons. He stated that he inspected the property in July of 2010, looked at the design drawings, and prepared a report of his findings. Mr. Campbell identified several substantial deviations from the plans and numerous deficiencies or defects in the work performed. He noted that there was a section in the footprint of the foundation where footing and chain wall were missing. He also identified photographs of defects in the structure. He noted that there was deflection of the floor where the chain wall was missing, many foundations where bolts were not secure or were missing, and the width of the chain wall was supposed to be 18 inches but varied from 15 to 17 inches, which could affect the integrity of the chain wall. He also noted that there was a gap where the chain wall was placed or an inability of the foundation be connected in such a fashion to adequately carry the load, which caused the structural integrity of the foundation to be at risk. As a structural engineer, he testified that it was his opinion that the chain wall should be rebuilt. He opined that it would be easier for a contractor to rebuild it rather than try to make adjustments in order to match the design.
On cross-examination, Mr. Campbell admitted that the structure is structurally sound and it appears to support the load, though it has deflection where a beam is missing and he noted that the entire structure “flexed” when he walked around it. He testified that cracks in the piers indicate that the piers are not carrying the load in some capacity or that the foundation does not have an ability to carry the load placed on it. He admitted that placing a continuous footing and bracing the structural area underneath the area with the pronounced deflection could rectify the problem.
In his report, Mr. Campbell indicated that he compared the design of the chain wall with the “as-built” footprint, and they were substantially different. ^Therefore, he opined that Tri-Dyne did not follow the design drawings prepared by the professional engineer, Mr. Pepper. He further indicated that a missing beam in the struc *580 ture caused the interior floor to show the absence of support by showing signs of floor deflection. He also stated that missing flat and/or lock washers demonstrate poor workmanship and the missing foundation and/or chain wall shows that construction was not completed per the engineering design. He further opined that TriDyne should have verified that the prefabricated concrete risers complied with the design prior to installation, and he stated that the cracks in the pre-fabricated concrete risers show poor workmanship and shortcomings in quality control. Mr. Campbell recommended that the foundation be replaced and a new foundation be constructed consistent with the approved design.
Edmond Pepper, an expert in structural engineering, testified for defendant, TriDyne. He stated that he prepared the plans for the elevation project at issue. He noted that it is not unusual to change the position of a pier or footing based on what is found during a project, but he acknowledged that it is good practice to consult a design professional. He stated that Mr. Sproules asked him to return to the site in February of 2011. He admitted that there were some deficiencies in the work performed, but he did not believe that they affected the ability of the structure to function as intended. He recommended that a sill beam be placed in order to alleviate the sagging or deflection of the floor.
Mr. Pepper testified that the construction was never completed, because a grade beam needs to be added where the floor is sagging and a damaged pier needs to be replaced. He also testified that he believes the work performed was not excellent or good, but only fair. However, he opined that the property is structurally sound in its current condition, though some repairs are recommended, and he does not believe that the structure needs to be torn down or rebuilt.
|sIn his report, Mr. Pepper stated that the foundation grade beams were not constructed according to plan, noting that the exterior and interior grade beams protrude approximately 20 inches above existing grade. The plans call for exterior beams to be constructed 6 inches above existing grade and interior beams to be constructed flush to grade. Mr. Pepper concluded that if left unremedied, this would likely result in poor foundation performance. Thus, he recommended that these void spaces created between grade beams be backfilled immediately to prevent collection of water. He also recommended that a system of pressure relief weep holes be drilled at regular intervals through each interior and exterior grade beam to relieve ground water pressure that may build up in the spaces once back-filled. He indicated that the construction is acceptable, requiring only minor remedial correction. He further opined that temperature or shrinkage cracks in the prefabricated concrete risers are normal and not of concern, but damaged or cracked units should be repaired or replaced.
At the conclusion of trial, the trial court allowed the parties additional time to submit post-trial memoranda. Thereafter, the matter was taken under advisement. On July 29, 2011, the trial court rendered a judgment in favor of the Melancons and against Tri-Dyne for $39,016.50, which was the amount paid by the Melancons to TriDyne. The court also ordered Tri-Dyne to pay the plaintiffs’ expert fees of $3,225.00, plus court costs and interest. Tri-Dyne and the Melancons have appealed this judgment.

LAW AND DISCUSSION

In its first assignment of error, TriDyne contends that the trial court erred in *581 awarding the Melancons, as damages, all amounts paid by the Melancons to TriDyne for the elevation of their home, because the proper measure of damages is the cost to repair any deficiencies or defects. It argues that both structural engineers,_y\Ir. Campbell and Mr. Pepper, indicated that the structure was “structurally sound.” It also asserts that Mr. Campbell admitted that the deflection in the floor could be rectified by replacing the missing footing and bracing the structural area underneath the area where the footing would be placed. It contends that the trial court should have considered the $5,059.85 repair estimate Tri-Dyne presented and subtracted this amount from the remaining amount due to Tri-Dyne under the contract.
The Melancons respond that the proper measure of damages under a construction contract is not always the cost of repairs to remedy the defect. Rather, they assert that courts have allowed the return of sums paid to a contractor when the construction was of no value and could not be remedied, and they believe the trial court agreed with their expert that the foundation needed to be rebuilt.
In its reasons for judgment, the trial court noted that the job was supposed to be completed in 14 days, but it was still not complete after four years and was not performed in accordance with the plans and specifications. He also noted that Tri-Dyne’s own expert admitted that the work was incomplete and not performed in accordance with the plans. Thus, the trial judge awarded the Melancons all amounts paid to Tri-Dyne, which was $39,016.50.
LSA-C.C. art. 2769 provides:
If an undertaker fails to do the work he has contracted to do, or if he does not execute it in the manner and at the time he has agreed to do it, he shall be liable in damages for the losses that may ensue from his non-compliance with his contract.
It is implicit in every construction contract that the work of the builder be performed in a good, workmanlike manner, free from defects in materials or workmanship. Cascio v. Carpet, 42,653, p. 10 (La.App. 2 Cir. 10/24/07), 968 So.2d 844, 851; Trahan v. Broussard, 399 So.2d 782, 784 (La.App. 3 Cir. 5/27/81). |inAn owner who seeks to recover damages from a contractor has the burden of proving: 1) the existence and nature of the defects; 2) that the defects were due to faulty materials and workmanship; and 3) the cost of repairing the defects. Lang v. Sproull, 45,208, p. 9 (La.App. 2 Cir. 4/28/10), 36 So.3d 407, 414; Mount Mariah Baptist Church, Inc. v. Pannell’s Associated Electric, Inc., 36,361, p. 9 (La.App. 2 Cir. 12/20/02), 835 So.2d 880, 887, unit denied, 03-0555 (La.5/2/03), 842 So.2d 1101.
The appropriate measure of damages as a result of the breach of a contract to build under LSA-C.C. art. 2769 is what it will take to place the homeowner in the position he deserved to be in when the building was completed. Martinez v. Reno, 99-114, pp. 4-5 (La.App. 5 Cir. 9/15/99), 742 So.2d 1014, 1016. Thus, the owner is entitled to the cost of repairing the defects or completing the work. Rice v. Mesa General Contractor, L.L.C., OS-115, p. 12 (La.App. 5 Cir. 5/27/08), 986 So.2d 122, 129. However, when the construction is so defective that it would be useless, the loss sustained is the price paid for the construction of the thing, plus the removal thereof, and the cost of restoring the premises to its former condition. Crescent Coating Company, Inc. v. Berghman, 480 So.2d 1013, 1019 (La.App. 5 Cir. 12/26/86); Ilgenfritz v. Radalec, Inc., 226 La. 59, 74 So.2d 903 (1954).
*582 In the present case, the trial judge awarded the Melancons the return of all the money they had paid to TriDyne, finding that Tri-Dyne did not complete the work agreed upon in the contract, that the work performed was not in accordance with the contract specifications, and that the work performed caused damage to the Melancons and their property. However, he did not find that the construction was so defective as to render it useless, and the testimony at trial did not establish that the construction could not be repaired.
|n At trial, plaintiffs’ expert, Pressley Campbell, did not indicate that the structure was useless. Rather, Mr. Campbell stated that the structure was safe to enter and was structurally sound. He also indicated that it appears to “support the load that it’s supposed to support,” though there is deflection in the area where a beam is missing. Although Mr. Campbell testified that the foundation needed to be rebuilt, he stated that “it just would be easier” to rebuild rather than to make adjustments in order to match the design.
The record as a whole demonstrates that some of the work performed by Tri-Dyne was substandard and that there are a number of defects that need to be repaired. However, because the structure is not so defective as to render it useless, we find that the trial court erred in awarding the Melancons the return of all the money they paid to Tri-Dyne. Rather, the appropriate measure of damages that should have been awarded is the amount necessary to repair the defects. Accordingly, we reverse and vacate the judgment awarding $89,016.50 to the Melancons.
The record before us does not contain sufficient evidence to determine the amount necessary to repair the defects. Although Mr. Sproules prepared an estimate of what he believes it would cost to repair the defects, there was insufficient testimony to establish that all of the defects proven at trial could be remedied for $5,059.85.
LSA-C.C.P. art. 2164 provides that the appellate court shall render any judgment which is just, legal and proper upon the record on appeal. Ray Brandt Nissan, Inc. v. Guruich, 98-634, p. 2 (La.App. 5 Cir. 1/26/99), 726 So.2d 474, 476. The purpose of LSA-C.C.P. art. 2164 requiring appellate courts to render judgment which is just, legal, and proper upon record on appeal is to give the appellate court complete freedom to do justice on the record regardless of whether |]2a particular legal point or theory was made, argued, or decided by the court below. Safeway Ins. Co. of Louisiana v. State Farm Mut. Auto. Ins. Co., 36,853, p. 8 (La.App. 2 Cir. 3/5/03), 839 So.2d 1022,1027.
Based on the entire record before us, we find that in order to reach a just result in this matter, the case must be remanded to the trial court for the parties to present evidence of the cost necessary to repair the defects caused by the work performed by Tri-Dyne, and for the trial judge to determine the cost of repairs that should be awarded to the Melancons. See Henderson v. Diamond Datsun, Inc., 413 So.2d 542, 545 (La.App. 4 Cir. 4/7/82), in which the Fourth Circuit found that the damage estimates provided by plaintiff were inadmissible hearsay and the Court remanded for a determination of damages.
Considering our ruling to remand this matter for further evidence, we pretermit discussion of the remaining assignments of error asserted by Tri-Dyne.
The Melancons appealed the judgment and asserted that the trial court erred in only awarding plaintiffs the return of all sums paid to Tri-Dyne, because the proper measure of damages when construction de *583 fects cannot be corrected is not only the price paid but also the costs of removing the defective construction. However, considering our determination that the Melan-cons are entitled to the cost of repairing the property, not the entire price paid, this assignment of error is without merit.
| ^DECREE
For the foregoing reasons, we reverse and vacate the judgment awarding $39,016.50 to plaintiffs. We also remand to the trial court for the parties to present evidence of the cost of repairs and for the trial court to determine the proper amount of damages to be awarded to plaintiffs.

REVERSED, VACATED, AND REMANDED

. Mr. Sproules defined ''cribbing” as "a style where they use a cross system of 6x6’s to help shore up the house during the demolition and the reconstruction of the footing and the foundation system.”