313 So.2d 286 (1975)
Maurice S. NEEL, Plaintiff-Defendant in Reconvention-Appellee,
v.
Tom O'QUINN, Defendant-Plaintiff in Reconvention-Appellant.
No. 4967.
Court of Appeal of Louisiana, Third Circuit.
April 21, 1975.
Rehearing Denied June 18, 1975.
Writ Refused September 25, 1975.
*287 McHale & Bufkin by Louis D. Bufkin, Lake Charles, for defendant-appellant.
Gary A. Book, Lake Charles, for plaintiff-appellee.
Before FRUGE, CULPEPPER and DOMENGEAUX, JJ.
DOMENGEAUX, Judge.
This is a suit by the plaintiff for damages for defective construction of a residence. The defendant-contractor filed a reconventional demand seeking the balance allegedly due under a building contract executed by the parties. From a judgment in favor of the plaintiff, in the sum of $5,680.00, the defendant has appealed. Plaintiff neither appealed nor answered the appeal.
On or about July 3, 1972, plaintiff and defendant entered into an oral building contract under which the defendant was to *288 construct a house for plaintiff in Jefferson Davis Parish for an agreed price of $17,000.00. Of this latter sum the plaintiff made a $5,000.00 down payment directly to the defendant and borrowed the remaining $12,000.00 from Guaranty Federal Savings & Loan of New Orleans, with the latter actually retaining the loaned money and making subsequent partial payments to the defendant.[1] According to the defendant the foregoing contract price excluded electrical wiring and painting. Plaintiff denied this allegation at trial but admitted that the parties later agreed that defendant would wire the house for the additional cost of $720.00. There were no written plans or specifications under the contract, with the exception of a rough, one-sheet floor plan or sketch showing the dimensions of the house and a front view. In this regard, however, plaintiff testified that previous to any agreement he visited several homes built by the defendant in Westlake, Louisiana, and at that time agreed to pay the defendant $17,000.00 if he would build a similar or like one for him.
Defendant began work on the house immediately following the agreement, pouring the concrete slab sometime early in July. Plaintiff testified that during the construction of the house he made numerous complaints to the defendant concerning a number of noticeable defects (which included the wall paneling in some areas not matching up with the wall studs) and his displeasure with certain other items, such as the type of ceiling being used in the construction. The defendant-contractor apparently made no effort at this time to repair the noted "defects" or change any of the materials being used.
Prior to completion of the house the defendant left for Europe on vacation. This pending vacation was known by the plaintiff previous to contracting with the defendant and the contractor was apparently attempting to finish the construction before leaving. At this time, however, it was agreed between the parties that the defendant would finish the house upon his return, in addition to correcting some of the "defects" noted by the plaintiff. The plaintiff and his family moved into the home sometime in mid-August. During defendant's absence, the plaintiff allegedly found a number of other "defects" in material and construction, some of which were corrected by the plaintiff, or parties other than the defendant, shortly after the house became occupied.[2]
Upon defendant's return in October, 1972, plaintiff again apparently made numerous complaints to the defendant to correct a number of the defects and deficiencies. The record reflects that defendant did make at least the following repairs and corrections: (1) changed septic tank to comply with Board of Health regulations as to size; (2) replaced all of paneling in one bedroom; (3) had an electrician change the main electrical breaker box to expand its capacity; (4) caulked an undetermined number of windows in one bedroom. Defendant also testified that in an effort to compromise (although denying he ever contracted to do so) he hired a painter and furnished the material to paint both the exterior and interior of the house. The contractor indicated that it was agreed between he and plaintiff to split the cost of the painting, but that plaintiff never paid his share. He further testified that he had a number of meetings with plaintiff and an *289 attorney and that, as a result, he also attempted to move the hot water heater, which was in the utility closet, so the room could be used as envisioned. Plaintiff testified that the utility closet was constructed so small that the washer and dryer would not fit. The contractor further indicated that he had a roof leak fixed which was called to his attention.
Subsequently plaintiff's attorney in the present suit sent the defendant a letter on or about May 24th, 1973, listing plaintiff's complaints and certain defects and asking the contractor to repair them. Admittedly, after receipt of the letter defendant made no effort to remedy any of the defects.
This suit was subsequently filed on September 21, 1973. In plaintiff's petition thirty-one defects were listed.[3]
As aforementioned, defendant filed an answer and reconvened, seeking $3,774.90 as the amount alleged to be the balance due under the building contract.
Two issues are presented to us on appeal. (1) Was the building contract "substantially performed" by the defendant contractor? (2) If so, is the plaintiff-owner nevertheless entitled to recover damages for the defects shown in the home?
Applicable to the present case are the following legal principles:
It is implied in every building contract that the work of the builder be performed in a good workmanlike manner, free from defect either in material or workmanship. Nichols Ford Co., Inc. v. Hughes, 292 So.2d 345 (La.App.2nd Cir. 1974).
The basic law in regard to a contractor's liability for failure to properly *290 perform a building contract is found in LSA-C.C. Art. 2769, as follows:
"Art. 2769. Contractor's liability for non-compliance with contract.
If an undertaker fails to do the work he has contracted to do, or if he does not execute it in the manner and at the time he has agreed to do it, he should be liable in damages for the losses that may ensue from his non-compliance with his contract."
This codal provision has been construed by the courts to mean that when a contractor has "substantially performed" a building contract, even though certain defects are present, he is entitled to recover the contract price, and the owner is relegated to having the price reduced by the amount necessary to perfect or complete the work, i.e. damages attributable to the breach. Airco Refrigeration Service, Inc. v. Fink, 242 La. 73, 134 So.2d 880 (1961).
In turn, if the building contract has not been substantially performed, the contractor's recovery is limited in quantum meruit. In the same regard, if the defects are such that cannot be corrected except by removing and replacing the construction, under the jurisprudence the owner may require the contractor to remove the object from his land and restore the premises to their prior condition. In addition, the owner is entitled to damages. National Water-Purifying Co. v. New Orleans W. W. Co., 48 La.App. 773, 19 So. 865 (1896); Toepfer v. Thionville, 299 So.2d 415 (La.App. 4th Cir. 1974); Scott Fence & Insulation Co., Inc. v. Boudro, 252 So.2d 458 (La. App. 4th Cir. 1971); Montague v. Milan, 67 So.2d 351 (La.App. Orl.Cir. 1953); Home Services v. Marvin, 37 So.2d 413 (La.App. Orl.Cir. 1948).
Thus the essential question for determination in a building contract suit is whether the contract has been substantially performed. The burden of showing same is on the contractor trying to recover the contract price or the balance due thereon.
Substantial performance is said to exist when the house (or other construction) may be used for the purpose intended even though certain defects or omissions in construction exist. Master Maintenance Engineering, Inc. v. McManus, 292 So.2d 284 (La.App.1st Cir. 1974); Jerrie Ice Co. v. Col-Flake Corporation, 174 F.Supp. 21 (E.D.La.1959), affirmed 278 F.2d 508 (5th Cir. 1960).
Whether or not there has been substantial performance is a question of fact. Among the facts to be considered include the extent of the defect or non-performance, the degree to which the purpose of the contract is defeated, the ease of correction, and the use or benefit to the owner of the work performed. Airco Refrigeration Service, Inc. v. Fink, supra; U-Finish Homes, Inc. v. Michel, 183 So.2d 101 (La.App.1st Cir. 1965), writ refused, 248 La. 1025, 183 So.2d 650 (1966).
Once substantial performance has been shown the burden of proof then shifts to the owner who must prove the existence and nature of the alleged defects, that they are due to faulty material and/or workmanship, and the cost of repairing the defects. Nichols Ford Co., Inc. v. Hughes, supra; U-Finish Homes, Inc. v. Michel, supra.
After a trial on the merits in the present case, the district judge, in holding for the plaintiff owner, made the following findings of fact: (1) the final contract price was actually $17,720.00, i.e. $17,000.00 original price plus $720.00 agreed for electrical wiring; (2) the evidence supported 25 of the 31 defects listed in plaintiff's original petition; (3) the original contract did not include painting and therefore defendant would not be liable for any deficiencies in this regard; (4) proof was lacking as to the alleged defective slab and improperly installed air conditioning ducts; (5) some defects were not correctable, such as "walls out of plumb".
As a result of these findings, the trial judge concluded that the quality of materials *291 used in the plaintiff's home was "so inferior" and that the workmanship "so shoddy" as to warrant the finding of lack of substantial compliance with the contract. Accordingly, it was held that the defendant would be entitled only to the sum of $12,040.00 on a quantum meruit basis, i.e. the present worth of the construction according to the testimony of one of the plaintiff's expert witnesses. But, as aforementioned, no evidence was presented to support defendant's claim in reconvention and the record was void in regard to the amount, if any, left due and owing to defendant under the contract. As a result the trial judge denied the claim and awarded the plaintiff judgment for repairs against the defendant-contractor in the sum of $5,680.00, i. e. the difference in the estimated present value of the house and the final contract price of $17,720.00. The judge did so, however, recognizing possible error in the judgment and explicitly offered an opportunity for the defendant to bring evidence into court of the total amount of the loan disbursements received, by way of a limited new trial. No application for a new trial was made.
After reviewing the record and evidence on appeal we cannot say the trial court erred in the foregoing factual findings. Insofar as the holding, however, that the defendant did not substantially perform the building contract, we disagree.
Under the existing jurisprudence substantial performance by a contractor is readily found, despite the existence of a large number of defects in both material and workmanship, unless the structure is totally unfit for the purpose for which it was originally intended. Clark v. Whitener, 296 So.2d 393 (La.App. 2nd Cir. 1974), writ refused 299 So.2d 795 (La.1974); Master Maintenance Engineering, Inc. v. McManus, supra; Kenny v. Oak Builders, Inc., 224 So.2d 161 (La.App. 4th Cir. 1969). The evident purpose intended for the construction in the present case was to provide living quarters for the plaintiff and his family. The residence has been used as such since August, 1972, and under the facts of this case we cannot say that the defendant-contractor did not substantially comply with the contract.
Accordingly, the defendant-contractor (plaintiff in reconvention) was entitled to receive the final contract price $17,720.00, less (1) the $5,000.00 down payment paid by plaintiff to the defendant; (2) any amount defendant may have previously received from plaintiff's $12,000.00 loan from Guaranty Federal Savings & Loan; and (3) any amount shown by the plaintiff-owner to be the cost of repairing defects in the house due to the defendant's use of faulty materials or workmanship.
In regard to the defects, plaintiff offered the testimony of two experts. Paul Thompson, a Lake Charles architect, was recognized as an expert in the field of architecture, contracting, and carpentry, and testified that he was hired by the plaintiff to inspect his house and prepare a report. The ensuing report listed 21 items, which were actually the first 21 of the 31 defects listed by the plaintiff in his original petition. Specifically, his testimony revealed that it was not good building practice to use the bright exterior nails because they would rust; the paneling used was the cheapest you could buy; the ceiling tile was applied to strips rather than a solid surface as was customary in South Louisiana due to the humidity; State Sanitary Code required venting of bathrooms; it was not normal or acceptable building standards to permit the paneling to run flush with the floor without the use of base shoes; the cabinets lacked substantial support, etc. In summarizing the quality of work in the house he used the words "shoddy" or "mediocre".
Also called to testify was Kermit Williams, a Baton Rouge realtor, appraiser, and builder of homes. He noted many of the defects listed by the plaintiff, plus others, including (a) exterior substandard brick laying; (b) leaks in the roof; (c) poorly installed lintels above windows; (d) poorly fitted door casings and mouldings *292 causing the doors to be "out of plumb"; (e) exceptional poor quality of simulated paneling, which was made of pasteboard rather than wood; (f) kitchen cabinets improperly sized and fitted; (g) inexpensive metal bathroom shower with plumbing holes cut on wrong side so that water leaked between shower and wall; (h) the wall studs were not 16 inch centers; (i) switch plates for a number of receptacles improperly fitted with some places where edge was on door frame leaving space behind plate; (j) kitchen counter material of poor quality; (k) cabinets not really usable for purpose intended; (l) kitchen window installed approximate 6 inches below level of all others; (m) windows finished with lower interior frames not conforming to standard construction practice; (n) ceiling tile very inexpensive, cheap styrofoam (and in fact no one handles it today) and its strip backing was poor construction practice.
In regard to his overall impression of the house Williams stated that in his opinion the house "was just not marketable" as it stood when he inspected it; that the material and workmanship was "very poor"; and that the quality of construction, material, labor and everything about the home was simply substandard. He concluded the value of the home it its present state to be only $12,040.00 and that it would take, at the minimum, $6,020.00 to bring the house up to a quality to make it marketable. This $6,020.00 figure did not include work on the aforementioned kitchen window, doing anything about the quality of the bricking, the slab, or the walls being out of plumb (some items of which would be incorrectable without the destruction of the house). The repair figure did, however, include painting, for which the defendant denied he was obligated to perform under the contract.
The defendant himself testified in his own behalf, indicating that at least a significant number of the alleged defects could be repaired for the total cost of $46.57. This testimony, however, seems far out of line with the above expert witnesses called on behalf of the plaintiff and we therefore reject it as being self-serving, just as the trial judge obviously did.
Thus the only evidence in regard to the cost of repairing the correctable defects was the testimony of Mr. Williams, who gave the aforementioned $6,020.00 estimate. Notably, however, this estimate included interior and exterior painting which the trial judge held was not included in the original contract. Considering this fact, among others, we opine there is sufficient proof offered to support a credit for repair costs, in plaintiff's favor, against the original contract price in the $5,680.00 amount awarded to the plaintiff by the trial judge.
The question, however, remains: Just what, or who, is this $5,680.00 award to be credited or adjudged against? If the defendant-contractor received from the aforementioned $12,000.00 loan, a sum in excess of $7,040.00 (i. e. $12,720.00 less $5,680.00 for repairs), then defendant should be required to reimburse any such excess to the plaintiff. If in turn, defendant did not receive $7,040.00 in disbursements from the loan, he should be awarded any balance due up to this amount.[4] We are at a loss from the record however to determine just how much the defendant did receive in loan disbursements. As a result, equity requires that we remand the case to the district court for the limited purpose of taking evidence on this point alone.
For the above and foregoing reasons we remand this case to the district court for the purpose of taking limited additional evidence, as indicated, and for awarding judgment not inconsistent with the reasoning herein.
Remanded.
NOTES
[1] The record is devoid of evidence in respect to the exact amount which defendant received out of the $12,000.00 from the banking agency.
[2] This work allegedly included (1) some rewiring to furnish electricity to a number of receptacles and light fixtures which lacked same and to run a 220 volt line for the air conditioner and furnace; (2) installing a new air conditioner, the cost of which admittedly came out of the $12,000.00 loan; and (3) painting, which, as aforementioned, the defendant alleges was not included in the original contract.
[3] 1. No window caulking

2. Bright nails instead of galvanized on exterior
3. Electric meter not installed according to code, crooked
4. Insulation on A/C refrigerant line inadequate
5. No paint was applied to the exterior of the house
6. Kitchen Cabinets: Top cabinets pulling away, bottom does not fit floor, part of plastic topping loose
7. Washer-Dryer closet too small for removal of units
8. Wiring to hot water heater not according to code
9. No base shoe anywhere in house
10. Paneling loose throughout house
11. Door casings loose, improperly nailed
12. A/C plenenum leaking excessively, cool air escaping in volume
13. All interior doors poorly fitted and out of plumb, some not finished
14. Ceiling coming down in girl's bedroom and bathroom #1
15. Paneling and molding in boys' bedroom loose from plumbing repairs
16. Wallpaper in bathroom #1 poorly in stalled and cracking
17. Caulking around bathtub incomplete
18. Bath #2: Wallpaper poorly installed wall switch out of plumb, shower rusting out at bottom and is trimmed on wrong side
19. Painting on all trim on interior incomplete
20. Front door not painted, improperly fitted
21. All walls in house checked with level and are out of plumb
22. Roof is improperly braced and constructed to such an extent that insurance coverage cannot be obtained
23. Walls throughout the house are improperly constructed
24. Concrete slab foundation is made of poor grade of concrete that has already started to crumble and wash away
25. Septic tank was too small and the field lines were not properly installed
26. Ventilating hood over stove improperly installed, vented only to the attic, no outside vent
27. Bathroom not vented
28. Central Air conditioning unit was wired to 110 volt power source instead of 220 volt power source
29. As a result, Air conditioner compressor burned up
30. Air conditioning cooling ducts were improperly installed resulting in all the cold air escaping into the attic
31. Drainage pipe from kitchen sink and washing machine ended approximately 2 feet from house and were not hooked up to septic tank
[4] This is essentially the same outcome which the trial judge proposed to reach if introduction of additional evidence had been sought by way of a limited new trial.