986 So.2d 122 (2008)
Carol RICE and Richard D. Rice
v.
MESA GENERAL CONTRACTOR, L.L.C. and Fred L. Mesa.
No. 08-CA-115.
Court of Appeal of Louisiana, Fifth Circuit.
May 27, 2008.
*123 Alan P. Dussouy, Metairie, Louisiana, for Plaintiffs/Appellees.
*124 Richard J. Tomeny, Jr., Metairie, Louisiana, for Defendant/Appellant.
Panel composed of Judges THOMAS F. DALEY, MARION F. EDWARDS, and GREG G. GUIDRY.
THOMAS F. DALEY, Judge.
Appellants, Mesa General Contractors, L.L.C. (Mesa) and Fred Mesa, appeal from a judgment finding that Mesa breached its construction contract with plaintiffs, Carol and Richard Rice (plaintiffs), and awarding damages in the amount of $79,539.08. Plaintiffs hired Mesa to construct an addition to their home over an existing garage. The trial court also rejected a reconventional demand made by Mesa against plaintiffs for the amount of $6,668.34, representing the amount allegedly due Mesa from plaintiffs under the contract. The trial court further declined to find Fred Mesa personally liable under the contract. The trial court awarded the plaintiffs $79,539.08 in damages.
Mesa appeals the trial court's judgment.[1] Mesa argues in brief that the evidence shows that Mesa did fully perform the construction in accordance with its contract, and further, that it was not responsible to supervise the work, as it was not hired as a general contractor. Mesa argues that the trial court erred in holding it liable for the differences in its contract with the owner and the specifications in the plans drawn up by the architectural designer, when those plans were not part of the contract between the owner and Mesa.
Mesa also argues that plaintiffs cannot now complain of different materials being used than the ones specified in the plans, because they were present when the alternate materials were installed/used, and failed to complain at that time, only complaining after the work was completed.
Mesa further argues that plaintiffs did not bear their burden of proof regarding breach of contract, nor the amount of damages. Mesa argues that the trial court erred in allowing into evidence an accounting ledger prepared by plaintiff, when the document was not listed on the pre-trial order, nor produced during discovery.
We affirm the judgment of the trial court that Mesa breached the contract with the plaintiffs, but on a different basis. We further amend the damage award as noted below.

FACTS
In 2003, plaintiffs desired to build a second floor addition on top of their existing garage. They had plans for the addition drawn up by Ronald Authement, an architectural designer and draftsman. He testified that he visited the property several times and drew up a plan, which was then reviewed by a civil engineer to determine structural load requirements, something that Authement was not qualified to do on his own, not being an architect. After the plans were finished, the Rices sought bids from three contractors. They ultimately selected Mesa General Contractor to perform certain items of construction under the plans. The plaintiffs testified that they never met or talked with Mr. Mesa, but dealt with Mr. Alan Thibodeaux, the construction supervisor for Mesa.
Plaintiff, Carol Rice, testified that she gave Authement's plans to Mr. Thibodeaux in order for him to work up the bid. Mesa's contract proposal is dated May 25, 2003 and lists a contract price of $64,875.00 *125 for Mesa's work. The contract states that the job should be complete within 12 weeks. Testimony from Mrs. Rice and Thibodeaux established that work began within two weeks of the contract's execution. Testimony also revealed that the job lasted at least 36 weeks, and that the "punch" list was never finished due to a breakdown of the relationship and this suit being filed. Mrs. Rice testified that Mr. Thibodeaux's last day on the job was February 3, 2004, at which point she felt he had not finished the scope of his contract work.
When Thibodeaux returned the contract, Mrs. Rice admittedly did not check to see if the contract provisions matched the plans, because she "assumed" they did match. It was shown at trial that in several respects, Mr. Thibodeaux's bid proposal contained differences with the plans, most notably changing Authement's specification for the floor joist system, using 2×10 joists instead of 2×12s as called for in the plans. This item, though not pointed out specifically by Thibodeaux, is clearly shown on page one of the contract. The evidence at trial showed that both parties went over the contract prior to signing it. There are several handwritten notations and changes that were made on the contract prior to signing it.
Whereas Mrs. Rice testified she felt Mesa was the "general contractor" on the job, the Mesa contract showed that Mesa did not undertake supervision of the entire job. The scope of Mesa's work was not to bring the project to completion, as the Rices would undertake interior finishing work after Mesa would finish their portion of the job. The plaintiffs secured their own building permit.
Mrs. Rice testified that problems started almost immediately; for instance, the contractor did not remove debris from her yard every day as he had promised, which prevented the plaintiffs' dogs' use of the yard until it was cleared every night.
In particular, plaintiff noted the following items with which she was dissatisfied. The window in the front of the addition was out of square. The floor joists were unevenly spaced, so hanging drywall was very problematic. The back door was not aligned properly, and there was a leak under the plate. Many of the floor joists sagged, as evidenced by photos entered into evidence. Ripped visquene covered the demolished ceiling of the garage and failed to protect areas underneath it from the elements. Hurricane clips (straps) in the roofing were either not used or were underused in areas.
Mrs. Rice noted that the roof of the addition did not tie in well to the existing structure. The plans had the hips and valleys lining up to each other in a parallel fashion. As built, the hips and valleys of the old house and the addition were not parallel to each other, but formed "parallelograms." It was visually displeasing, though Rice admitted the roof did not leak. Mrs. Rice noted that the contract called for the windows to match the existing structure, but the windows that Thibodeaux ordered did not match at all. Thibodeaux admitted that he did not take the time to find matching windows, but tried to blame that delay on Mrs. Rice. Mrs. Rice also noted that the contract called for hand-split cedar shake siding to match the existing house, but a different product was delivered. Mr. Thibodeaux admitted that he probably did not tell his supplier to order the correct item, but again tried to blame the resulting delay on Mrs. Rice. She was additionally unhappy that the weather sheathing underneath the siding was torn in places, which compromised the moisture barrier, and was apparently not corrected before the siding was installed. *126 (Thibodeaux testified that he did not know whether it got corrected.) The siding itself was installed incorrectly and had to be redone.
Other problems included water damage in the main house, along the outside wall and in the master bathroom, guest bedroom, and bath. It was discovered by Ron Daigle, a contractor whom the plaintiffs engaged to fix the floor joist system, that there was no a/c vent in the bathroom, and that there was only one (1) 6 inch a/c vent in the entire upstairs room, which was inadequate.
Mrs. Rice additionally complained about the inconvenience that the project's delay and prolonged finish date caused her family. She denied, however, restricting the contractors' access to the job while she was at work in the mornings. She explained she told Thibodeaux that if the contractors were not there by 9:00 a.m., she wouldn't put the dogs in their run, which would restrict the contractors to working inside the structure until she returned home after 1:00 p.m. Mrs. Rice complained that Thibodeaux failed to supervise his own sub-contractors, and on more than one occasion, the Rices paid Mesa's subcontractors directly, which was not their responsibility.
On cross examination, Mrs. Rice reiterated that she was unaware that Mesa's contract differed in so many details from the design plans drawn up by Authement. She admitted that the building inspector from the Parish inspected the work in December of 2003 and, after getting an engineer's approval on various items, including the floor joists and roofing, gave the "ok to close" (the walls). She admitted that she did not sue Mr. Wethern, the engineer who approved the construction for the parish's building inspector.
Mrs. Rice testified that Mr. Thibodeaux never received her punch list, because he "cut off the process" on February 5, 2004. Mr. Thibodeaux testified that at that point, he couldn't "appease" Mrs. Rice anymore.
Around May of 2004, Mrs. Rice became concerned that Mesa had not performed its work properly, so they engaged a home inspector, Mr. Paul DiLeo, to evaluate the construction. Mr. DiLeo, who was qualified as an expert in residential construction, rendered a report on June 15, 2004, that identified several areas of substandard construction. DiLeo explained that he inspected the construction first, and then sat down with the plans to correlate his findings with the plans. DiLeo explained that he was not an engineer, and would defer to an engineer regarding load calculations.
First, DiLeo found the entire floor joist construction to be inadequate, as Mesa used 2×10s when the designer's plans called for 2×12s, and further, that the 2×10s were compromised because they had been "notched" to fit the plate, and were thus inadequate to carry the expected second-floor load. He further found that the joists were haphazardly placed instead of being 16' on center, as required by the contract, the plans, and applicable construction standards.
DiLeo further found that no blocking or bridging was used, except down the center line, which he testified was required by applicable building codes. He found floor joist hangers that were improperly secured, and that not enough of them were used. DiLeo testified that joist hangers are fine if used correctly, which he found were not. He found H-clips that were incorrectly or inadequately nailed in. He found that an attic purlin brace was missing. He found an inadequate use of deadwood, which he testified was necessary to hang sheetrock correctly. He found the *127 window improperly framed and in the wrong location.
DiLeo found the asymmetrical hips and valleys on the roof, which he opined were necessary for proper drainage off the roof. He also found that some window casings and door jambs were purchased too small for them to fit around the sheetrock. He found a combination of poor lumber quality and poor installation.
DiLeo further noted that the plans called for heavy-duty Microllam beams, which Mesa eliminated entirely from the structure. He found that Mesa instead nailed two (2) 2×10s together, which he said was not as strong. He felt the roof was improperly constructed because it was not built to the plans; the ridge was in the wrong place, the purlin brace was missing, the roof was missing some cross ties, and a 2×4 brace was used instead of the specified 2×6 brace. He issued an addendum to his original report on June 26, 2004, in which he discussed how the notching in the floor joists further compromised its load-carrying ability. He testified that he was aware that at the point of tie in, the existing house had 2×10 joists, but said that it could have been correctly used in the existing structure depending on the load requirements at that location.
DiLeo opined that plaintiffs' best option was to tear out the entire renovation and start over. He based this opinion on the fact that the 2×10 floor joists were inadequate and poorly done, plus the roofs improper construction, structurally and aesthetically.
Mr. Thibodeaux, the job supervisor for Mesa, testified for the defense. He was the person responsible for drawing up the contract and supervising the work. He explained much of the project's delay was caused by trying to "appease" Mrs. Rice, but it was revealed instead that many of the delays were caused by his negligence or inattention to the details of the contract. In particular, the incident with the electrical meter and the power outage was due to improper actions in moving the electrical power stem, not a thunderstorm as Mr. Thibodeaux testified. Further, the failure of the windows and siding to match the existing structure, as per the contract, was not attributable to Mrs. Rice. Thibodeaux testified that he performed some items that were extra-contractual and paid for them himself, just to appease the client.
Thibodeaux testified that the parish's building inspector requested an engineer's approval of the various changes that Thibodeaux made to the plans, and such approval was made following some requested corrective work, and the construction passed the inspection.
Thibodeaux disagreed in many places with Mr. DiLeo's report. He said that he did use blocking and bridging down the center line, but disagreed it was necessary elsewhere, where its absence was noted. He explained that it is impossible to put all the joists exactly 16' on center, and explained how he compensated for the differences. He stated that he made the decision to use 2×10 floor joists because the existing house had them at the point of tie in, and noted that they were approved by the engineer prior to the final inspection. He explained that he didn't need joist hangers where DiLeo noted their absence, because the joists were sitting on top of the plate. He disagreed that the lumber he used was of "marginal" quality. He disagreed that the random spacing on the joists compromised the strength of the structure. He agreed that the joist hangers were randomly used, because he only used them where he needed them.
Thibodeaux explained that Mrs. Rice only complained about the hip and valley on the roof in one spot, where it showed as *128 people drove up to the house. He claimed that he straightened it out to her satisfaction, and offered to fix the one in the back, but she declined. He didn't agree with DiLeo's report regarding the wrong size window casings and door jambs. He claimed that the problem there was with the existing wall.
Thibodeaux said that he kept a set of plans on the job so the subcontractors could refer to them. He admitted that he was not on the job every day. Rice, however, claimed that the set of plans kept in the garage was ruined by rain when the roof was covered by the ripped Visquene, and with the other set being kept in Thibodeaux's truck, the subs frequently had no plans to refer to.
Thibodeaux testified that on many jobs he doesn't use H-clips when he uses 16' on center joists, but that his structures pass inspections. He agreed he probably missed the purlin brace, because he did not recall remedying it. He accounted for the uneven hips and valleys by claiming it was "that way" when a new structure was tied to an old one.
Thibodeaux admitted that he omitted the three Microllam beams, but claims that his triple 2×10 beam was stronger. He did not explain why he made this change. He admitted that he probably did not correct the ripped weather sheathing beneath the cedar shake siding, but that the Rices had not complained to him about leaks. He did not notice the bowed floor that is depicted on some of the photos in evidence. He claimed that he never finished his final punch out because the relationship with the Rices broke down.
The trial court asked for post trial memoranda and took the matter under advisement. Defendants argued that the plaintiffs failed to carry their burden of proof. In their memorandum, the plaintiffs asked for a total of $170,961.35, which represented plaintiffs' actual expenses of $83,961.35, as testified to by Mrs. Rice (which included the $17,000.00 to Daigle to fix the floor joist system), $75,000.00 to fix the roof, and $12,000.00 for inconvenience caused by the project's delayed completion.
On August 31, 2006, the trial court rendered judgment in favor of the plaintiffs, finding that Mesa had a duty to make a full and fair disclosure to the plaintiffs before making any changes to the plans and specifications prepared by the draftsman, and because Mesa deviated from the plans and specifications provided by plaintiffs, Mesa was liable for the consequences arising from such deviations. The trial court awarded the plaintiffs $79,539.08 in damages, disallowed Mesa's reconventional demand, and cancelled the lien Mesa filed on plaintiffs' property.[2]
LSA-C.C. art. 2769 states that if an undertaker fails to do the work he has contracted to do, or if he does not execute it in the manner and at the time he has agreed to do it, he shall be liable in damages for the losses that may ensue from his non-compliance with his contract. Under this article, a building owner seeking to recover damages from a construction contractor for defects bears the burden of proving: (1) both the existence and nature of the defects; (2) that the defects were due to faulty materials or workmanship; and (3) the cost of repairing the defects. Mount Mariah Baptist Church, Inc. v. Pannell's Associated Electric, Inc., 36,361 (La.App. 2 Cir. 12/20/02), 835 So.2d 880.
*129 We see no manifest error in the trial court's conclusion that Mesa breached the contract, but not for the same reasons. We find that the contract that was signed and executed between the parties, rather than the designer's plans (which were a guideline), was the legal document that controlled the scope of the work, including the various materials to be used. The Rices went over the contract with Thibodeaux before executing it. The record revealed that Mrs. Rice had a law degree, and as such was not a naive consumer. It is true that the contract contained some differences from the designer's plans, but these differences were not hidden. The Rices were responsible for being familiar with their plans and the contract, and may not evade their responsibility by "assuming" that the documents matched.
However, Mesa is liable to the Rices for substandard construction. The testimony substantiates defects in performance by Mesa, from both the standpoint of quality of materials and time that resulted in a substandard construction that required remedial action. The record as a whole demonstrates Mesa's (specifically, Thibodeaux's) negligence, sloppy construction, short-cuts, and inattention to specific contract details, all of which combined to create not only a substandard structure that needed significant repairs, as testified to by plaintiffs' expert, but vast delays in completion of the project.
The damage award represents $57,000.00 in payments that the plaintiffs made toward the total contract price; $17,000.00, which represents Ron Daigle's charge to fix the floor joist system; and $5,539.08, which represents amounts that plaintiffs paid directly to Mesa's subcontractors, and other expenditures plaintiffs made to repair damaged work. There was testimony that repairs to the roof were estimated at $75,000.00, though this figure was not supported by documentary evidence or testimony.
We find that the trial court abused its discretion in the amount of the damage award. The appropriate measure of damages as a result of a breach of a contract to build is what it will take to place the homeowner in the position he deserved to be in when the building was completed; the owner is entitled to cost of repairs necessary to convert the unsound structure into a sound one or the amount paid to remedy the defect. Martinez v. Reno, 99-114 (La.App. 5 Cir. 9/15/99), 742 So.2d 1014.
Further, under Louisiana law, a building contractor is entitled to recover the contract price even though defects and omissions are present when he has substantially performed the building contract. "Substantial performance" means that the construction is fit for the purposes intended despite the deficiencies; this is a question of fact for the trial judge. Mount Mariah Baptist Church, Inc. v. Pannell's Associated Electric, Inc., 36,361 (La.App. 2 Cir. 12/20/02), 835 So.2d 880. In fashioning its damage award and not awarding the plaintiffs the entire amount of damages they requested, the trial court implicitly recognized that plaintiffs did not prove that the structure was so defective that it should be demolished. There is no justification, then, for giving the plaintiffs their addition for free. Accordingly, we amend the damage award to delete from the award $57,000.00, which represents the amounts that the plaintiffs paid Mesa toward the contract.
The Rices also presented unrebutted evidence that Mr. Daigle's repairs to the joist system caused them to lose 27 square feet of living space. Accordingly, we will *130 award the plaintiffs $3,477.30 as compensation for that lost space.[3]
The damage award, as amended, is $26,016.38, which is the amount that plaintiffs demonstrated at trial they spent to correct defects on the work performed by Mesa ($17,000.00 paid to Mr. Daigle and $5,539.08 paid to Mesa's subcontractors and to make repairs to other damaged work, and $3,477.30 compensation for lost space resulting from repairs).
Accordingly, the judgment of the trial court in finding that Mesa breached the construction contract is affirmed. The damage award is amended to $26,016.38. The Second Amended Judgment dated November 8, 2007 is amended as follows:
IT IS ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of plaintiffs, Carol and Richard Rice, and against the defendant, Mesa General Contractor, L.L.C. ("Mesa"), awarding Twenty-Six Thousand Sixteen and 38/100 ($26,016.38) Dollars in damages, plus court costs and interest from date of judicial demand.
AFFIRMED AS AMENDED.
NOTES
[1] Plaintiffs do not appeal the portion of the trial court's judgment finding no personal liability on Mr. Fred Mesa.
[2] These rulings actually occurred in three separate judgments: an original judgment, an amended judgment, and a second amended judgment. See also this Court's opinion in the original appeal of this matter, 07-CA-545. Procedurally, it is the second amended judgment that is the subject of the present appeal.
[3] This amount is calculated as follows. Plaintiffs' exhibit 1 shows the addition's dimensions as 18 ft. × 28 ft., for a square footage of 504.27 sq. ft. equals 5.36 % of 504 sq. ft. 5.36% of the total contract price of the addition, $64,875, equals $3,477.30.