# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
October 31, 2013

Lyle W. Cayce
Clerk

No. 12-30904

SUPERIOR DERRICK SERVICES, L.L.C.,

Plaintiff - Appellee - Cross- Appellant

v.

LONESTAR 203, her engines, boilers, tackle, furniture, apparel, etc., in rem;
LONESTAR 204, her engines, boilers, tackle, furniture, apparel, etc., in rem,

Defendants - Appellants - Cross Appellees

v.

INTERCONTINENTAL BANK, P.L.C.; LONESTAR DRILLING NIGERIA,
LIMITED,

Claimants - Appellants - Cross - Appellees

Appeals from the United States District Court
for the Western District of Louisiana
USDC No. 6:09-CV-484

Before REAVLEY, ELROD, and, HAYNES, Circuit Judges.

PER CURIAM:[*]

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 12-30904

This appeal involves breach of contract claims arising from agreements between Superior Derrick Services, Inc. ("Superior") and Lonestar Drilling Nigeria, Ltd. ("Lonestar") for the refurbishment of two drilling barges. Although the parties entered into separate contracts covering different scopes of work, the common purpose of all the agreements was for Superior to complete the barge work so that Lonestar could employ the barges on a drilling job in Nigeria. The district court granted partial summary judgment in favor of Superior on what was known as the "Turnkey agreement" because of Lonestar's failure to pay the contract price, and it dismissed Lonestar's counterclaims. The court conducted a bench trial on Superior's remaining claims, allowing some of them but disallowing others. Both parties appeal. We AFFIRM.

I.

In April 2006, Superior and Lonestar entered into two identical Barge Refurbishment Agreements ("the Refurbishment Agreements") for Superior to perform refurbishment work on two drilling barges known as LONESTAR 203 and LONESTAR 204. The contract price was $14,490,462 for each barge. The Refurbishment Agreements set forth the scope of work by Superior but they did not include all of the work necessary for the refurbishment. According to the trial testimony, Lonestar reserved to itself some of this work. The barges were delivered to Superior's facility in New Iberia, Louisiana, where the project would be completed. Pursuant to the contract, Lonestar employees were given office space at the facility and access to the job site.

The project was beset almost immediately by disputes and delays related to the scope of the work, the time line for completion, and payment. During the course of the job more than one hundred written change orders were issued altering the scope of Superior's work, some of which included work that Lonestar was originally supposed to perform. As a result of the numerous change orders, the parties verbally agreed in April 2007 that Superior would undertake

2

additional work outside the original scope of the Refurbishment Agreements under a time and materials arrangement (the "Time and Materials agreement"). Unfortunately for the parties, this Time and Materials agreement did not resolve the problems. Superior believed that it was owed a substantial amount of money under the Time and Materials agreement, while Lonestar claimed that Superior unreasonably delayed the work and that funding was not a legitimate issue. At one point in December 2007, Superior threatened to shut down the project and stop working in a dispute over payment of $3 million for change orders.

By February 2008, Superior claimed in correspondence that Lonestar owed it more than $5 million for change orders related to the work under the Time and Materials agreement. In an effort to resolve their ongoing dispute, the parties met on March 11, 2008, and agreed to abandon the Time and Materials agreement and continue the project under a written turnkey agreement (the "Turnkey" or "Turnkey contract").

The Turnkey contract specifically stated that it was meant to replace the Time and Materials agreement but not to alter the original scope of the work set forth in the Refurbishment Agreements. The Turnkey, which essentially settled the parties' differences over the amounts due under the Time and Materials agreement, set forth a scope of work and provided for payment to Superior. The Turnkey scope of work included both work already completed and work yet to be done. After providing for various credits to Lonestar, a Turnkey price was established. In relevant part, the Turnkey indicated that the "total outstanding monies due to [Superior] and payable to [Superior] by [Lonestar] on account of [Superior's] claims on the discarded Time and Materials arrangement, . . . after the payment on account of $5,400,000 . . . is $3,396,901.37." The Turnkey stated that "save and except for this amount" Lonestar "is not indebted and [Superior] is not entitled to any further claim or amount." The Turnkey referenced an

attached "Final Reconciliation," which also set forth a "Balance due and payable to Superior" of $3,396,901.37.

The parties executed the Turnkey on March 26, 2008, but they made it effective as of December 28, 2007. Lonestar made the $5.4 million payment on account in March, and in April 2008 it also made a partial payment to Superior of $396,901.37, leaving an even $3 million owed under the Turnkey. In the ensuing months, the parties' dispute continued over the scope of the work, delays in the project, and payment due, and more change orders were issued. On April 15 and May 20, 2008, Superior sent emails to Lonestar asking about the money still due under the Turnkey, while Lonestar continued to complain about alleged project delays. In October 2008, Superior made a demand for payment, but no further payment under the Turnkey has ever been made.

In March 2009, Superior filed an *in rem* complaint, asserting maritime liens and requesting arrest of the barges. Superior claimed that it was owed damages of approximately $8 million under both the original Refurbishment Agreements and the Turnkey. Lonestar counterclaimed against Superior for contractual delay damages of approximately $28 million. Prior to trial, the district court held in a partial summary judgment ruling that Lonestar breached the Turnkey and owed Superior $3 million under that contract because Lonestar had not paid the Turnkey price immediately upon execution of the agreement. Because of Lonestar's breach, the district court also dismissed Lonestar's counterclaims for delay damages.

After a subsequent bench trial, the district court held that Superior suffered damages from breach of the Refurbishment Agreements in the amount of $5,667,554.25. Because Superior had completed 97% of the work under the contract, however, it allowed Lonestar a three percent credit off the price of the Refurbishment Agreements. The court awarded Superior $4,798,126.53. Both parties appeal. Lonestar challenges the district court's dismissal of its

counterclaims in the summary judgment ruling and the court's failure to apply a larger credit on the Refurbishment Agreements. Superior challenges the court's disallowance of certain claims under the Refurbishment Agreements, as well as its claims for extra-contractual work purportedly done under verbal agreements. Superior also challenges the court's calculation of interest. We first address Lonestar's appeal before turning to Superior's arguments.

## II.

We review *de novo* the district court's ruling on summary judgment. *Haverda v. Hays Cnty.*, 723 F.3d 586, 591 (5th Cir. 2013). In an admiralty case tried to the bench, we review the district court's legal conclusions *de novo* and its factual findings for clear error. *Stevens Shipping & Terminal Co. v. JAPAN RAINBOW II MV*, 334 F.3d 439, 443 (5th Cir. 2003).

## III.

## A.

As a preliminary matter, the parties dispute which law governs this appeal. Although the Barge Refurbishment Agreements contained a choice-of-law clause designating Louisiana law as controlling the contracts, the Turnkey contract did not contain such a clause. Lonestar contends that federal maritime law should therefore apply to the Turnkey. The Turnkey contract specifically refers to the Refurbishment Agreements, however, and provides that, with the exception of certain paragraphs related to payment and the scope of work, the Turnkey does not alter or void any provisions of the original Refurbishment Agreements. The Louisiana choice-of-law provision was thus not affected. Although the Turnkey was a separate contract, we agree with the district court that the Turnkey incorporated the choice-of-law clause, and Louisiana law applies. *See, e.g., One Beacon Ins. Co. v. Crowley Marine Servs., Inc.*, 648 F.3d 258, 267 (5th Cir. 2011); *see also* 11 Williston on Contracts § 30:25 (4th ed. 2013) ("When a writing refers to another document, that other document, or the

portion to which reference is made, becomes constructively a part of the writing, and in that respect the two form a single instrument.").

Lonestar argues that the district court erroneously concluded that it breached the Turnkey, thereby requiring dismissal of its counterclaims for delay damages, because it did not immediately pay $3 million due under the agreement. Lonestar contends that the "due and payable" language of the Turnkey was ambiguous and that it was not required to pay until the scope of work was complete. We agree with the district court that "due and payable" under the circumstances of this case established a debt that was presently due, not an amount that was to be paid only upon completion of the work.

Lonestar points to dictionary definitions of the words "due" and "payable" as support for its claim that the terms are ambiguous. Words in a contract are given their "generally prevailing meaning." LA. CIV. CODE art. 2047. We have previously acknowledged that "payable" "normally means that the debt is payable at once." *In re Ripley*, 926 F.2d 440, 444 (5th Cir. 1991) (Internal quotation marks and citation omitted). But rather than consider the terms of a contract in a vacuum, we must also look at the contract as a whole and interpret its provisions in light of each other. *See* LA. CIV. CODE art. 2050. Here, the Turnkey contract referred to the "total outstanding" money due from Lonestar to Superior and noted that this was the amount for which Lonestar was "indebted." The Final Reconciliation attached to the Turnkey provided for a $5.4 million payment on account for work already completed and left a "balance due and payable" of $3.39 million. Taken together, these terms show that the outstanding amount for which Lonestar was indebted to Superior, assuming the $5.4 million payment on account, was $3.39 million, which is the amount left "due and payable" at the time of the contract in March 2008. We need not resolve whether the amount was due on March 11, when the parties met and agreed to the Turnkey, or on March 26, when the parties formally executed the

6

Turnkey. The fact remains that the Turnkey's terms in the context of the whole contract refer to a presently owed debt.

Any doubt about this meaning is resolved against Lonestar because a presently owed debt rather than a debt to be paid in the future is consistent with the parties' conduct both before and after the Turnkey. *See* LA. CIV. CODE art. 2053 ("A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties."). Prior to the Turnkey agreement, the record shows a dispute between the parties about payment and supports Superior's contention that it had not been paid for a significant amount of work under the Time and Materials agreement. Superior clearly expected immediate payment of amounts due as part of continuing to work under the Turnkey.

This conclusion is supported by a pre-Turnkey letter dated February 27, 2008, from Lonestar's Chief Idisi to Superior in which Idisi affirmed that Lonestar expected to release $5.4 million to Superior and that the "balance if any would be paid" after Idisi's trip to Louisiana on March 10. Indeed, Idisi did travel to Louisiana on March 10. On March 11, he met with Superior and agreed to the Turnkey contract, which was a formalization of the parties' discussions to that point. Then, after execution of the Turnkey, Lonestar paid the $5.4 million as promised and also made a partial payment on the $3.39 million balance. If there was no debt presently owed and the Turnkey balance was not due until completion of the work, Lonestar would not have been required to make the partial payment. Lonestar provides no other explanation for why it did so. Moreover, Superior made repeated inquiry of Lonestar (in April, May, and October 2008) about payment of the Turnkey amount. Although early inquiries were more like friendly reminders rather than terse demands for payment, these inquiries would have been unnecessary and unwarranted if an amount was not

presently due. Indeed, Lonestar points to no contemporaneous responses to those inquiries indicating its belief that the Turnkey amounts were not due until some future date. Instead, Lonestar's responses merely reiterated Lonestar's complaint that Superior was delaying the work. These circumstances show that the balance under the Turnkey contract was presently due, that the parties knew and expected that the balance was due, but that Lonestar breached the Turnkey contract by failing to pay.

As a result of Lonestar's failure to pay the amount owed under the Turnkey, we can find no fault in the district court's dismissal of Lonestar's counterclaims for delay damages. "Louisiana recognizes the principle that where one party substantially breaches a contract the other party to it has a defense and an excuse for non-performance." *Olympic Ins. Co. v. H. D. Harrison, Inc.*, 463 F.2d 1049, 1053 (5th Cir. 1972). In other words, having failed to make payment as required by the contract, Lonestar cannot complain and seek damages because Superior did not deliver the barges when Lonestar wanted them.

Lonestar makes essentially two arguments in response to the district court's finding that its breach of the Turnkey contract excused Superior's performance and mandated dismissal of its counterclaims. It argues in part that its counterclaims included claims for damages under both the Turnkey contract *and* the original Refurbishment Agreements, as well as a claim that Superior wrongfully refused to return the barges without a release of liability. Lonestar argues that its claims for damages arising under the Refurbishment Agreements and for Superior's failure to return the barges are independent of the Turnkey contract, and therefore the claims should not have been dismissed. Lonestar did not raise this argument in opposition to Superior's motion for summary judgment, however, and may not raise it on appeal. *See Colony Creek, Ltd. v. Resolution Trust Corp.*, 941 F.2d 1323, 1326 (5th Cir. 1991) ("Appellants 'cannot

attack summary judgment on appeal by raising distinct issues that were not before the district court.'" (citation omitted)). Lonestar doubly waived this argument on appeal by raising it only in its reply brief. *See, e.g., Valle v. City of Houston*, 613 F.3d 536, 544 n.5 (5th Cir. 2010).

Lonestar also argues that, by continuing to perform under the Turnkey contract, Superior waived any claim that Lonestar's failure to pay the amount due excused Superior's alleged untimely performance. Lonestar further argues that Superior did not place it on notice that because of Lonestar's failure to pay Superior considered the contract dissolved or its own performance excused. We are unpersuaded.

Here, Lonestar failed to pay the Turnkey amount that was owed and that Superior was entitled to receive. Although Superior continued to perform work on the barges (which it was still required to do under the Refurbishment Agreements), it did not merely accept Lonestar's deficient performance. Superior inquired more than once about Lonestar's missing payment. Superior did not waive its right to insist on payment owed and due under the contract. *Cf.* 8 Corbin on Contracts § 40.5, at 544–45 (Revised Edition 1999) (recognizing that a builder's continuing to perform after non-payment "does not mean that the builder must now continue to wait forever"); *see also La. Highway Comm'n v. Farnsworth*, 74 F.2d 910, 914 (5th Cir. 1935).

## B.

Next, Lonestar and Superior both challenge the district court's credit to Lonestar of three percent of the contract price in the Refurbishment Agreements because Superior had completed only 97% of the work assigned to it. The Refurbishment Agreements contained a schedule of progress payments calling for a final payment of $2,120,231 per barge "[at] completion." Lonestar reasons that because the barges were not complete Superior was not entitled to any of the final payment and the court should have credited it the full amount of

$4,240,462 for both barges.  As part of its cross-appeal, Superior argues that because it substantially completed the barges, it was entitled to full payment of the price under the Refurbishment Agreements.  It contends that Lonestar was not entitled to any credit at all unless it produced evidence showing the nature and extent of the unfinished work and the amount of the costs to Lonestar to complete the work.

Under Louisiana law, a contractor who substantially performs on a building contract is entitled to recover the contract price even though defects or omissions may be present.  *See Airco Refrigeration Serv., Inc. v. Fink*, 134 So. 2d 880, 882 (La. 1961); *Rice v. Mesa Gen. Contractor, L.L.C.*, 986 So. 2d 122, 129 (La. Ct. App. 2008).  The owner may have "the price reduced by the amount necessary to perfect or complete the work, i.e. damages attributable to the [contractor's] breach" by failing to perform the contract completely.  *Neel v. O'Quinn*, 313 So. 2d 286, 290 (La. Ct. App. 1975).

Substantial performance occurs when a building or other construction may be used for the purpose intended despite defects or omissions in the construction.  *Id.*  "[T]his is a question of fact for the trial judge."  *Rice*, 986 So. 2d at 129; *Neel*, 313 So. 2d at 290.  "Among the facts to be considered include the extent of the defect or non-performance, the degree to which the purpose of the contract is defeated, the ease of correction, and the use or benefit to the owner of the work performed."  *Neel*, 313 So. 2d at 290.  The contractor bears the burden of proving substantial performance, while the owner bears the burden of proving the existence and nature of alleged defects.  *Id.*

In the instant case, evidence from both sides supports the district court's finding that Superior had completed at least 97% of the work on the barges.  Lonestar's project manager, Howard Berisford, admitted in a deposition that the work was 97% complete when the barges were arrested, while Superior's general

manager, Andy Gardner, estimated the work was 99% to 100% complete.  The court's acceptance of the 97% figure is not clearly erroneous.

Although Lonestar agreed that 97% of the work was completed, there was contradictory testimony about which tasks had been performed and when, as well as what was supposed to be in the scope of work. The district court was required to resolve the contradictory evidence, and by doing so it at least implicitly found substantial performance.  *See, e.g., Karno v. Bourbon Burlesque Club Inc.*, 931 So. 2d 1111, 1120 (La. Ct. App. 2006) (finding no error in a trial court's implicit finding of substantial performance); *see also United States ex rel. Riley v. Diran Co.*, 597 F.2d 446, 448 (5th Cir. 1979) (affirming district court's finding that substantial performance occurred where subcontractor had performed at least 90% of masonry work required in contract).  The burden then fell to Lonestar to prove its damages and what it had to do to complete the work.  Lonestar presented the testimony of John Esiegbuya that Lonestar spent $15 million to complete the work that Superior allegedly failed to perform.  There was no documentary evidence, such as contracts, invoices, or payment vouchers, supporting Esiegbuya's testimony.

In any event, the scope of work required for completing the vessels was also a highly contested point, as the parties disputed the contractual requirement for the barges' status at completion.  Lonestar believed the barges were supposed to be fully functional and meet the specifications of the American Bureau of Shipping classification society ("ABS class"), while Superior took the position that its scope of work did not require it to meet ABS class specifications. In fact, the contracts do not specifically state that the barges are to be ABS classed and fully functional, although certain items in the Turnkey refer to ABS. But Esiegbuya also testified that had Superior performed the intended work under the contracts (i.e., the Refurbishment Agreements and the Turnkey), the barges would have been ABS classed and fully operational.  If that is so, the

starting point must be the contract price, and without non-speculative evidence of actual costs incurred above the contract price, Lonestar must settle for a reduction of the contract price for the percentage of uncompleted work, as calculated by the district court. *Cf. Ducote v. Arnold*, 416 So. 2d 180, 183 (La. Ct. App. 1982) ("[T]he damages for breach of contract should be limited to the cost of completing the contract, under the same specifications, over the original contract price."). We find no basis to reverse the district court's decision to award as a credit to Lonestar only the percentage of unperformed work under the Refurbishment Agreements. We next turn to Superior's cross-appeal.

IV.

A.

Superior argues first that the district court erroneously held that it could not recover for work that was performed outside the scope of the Refurbishment Agreements, the Turnkey, and the change orders, but that was never invoiced to Lonestar. The district court held that the parties entered into an implied-in-fact contract governing this work and that pursuant to the implied contract Lonestar would not be required to pay additional sums for the work. We find no error in the district court's holding.

"An implied in fact contract is one which rests upon consent implied from facts and circumstances showing mutual intention to contract." *Morphy, Makofsky & Masson, Inc. v. Canal Place 2000*, 538 So. 2d 569, 573 (La. 1989). Superior does not contest the district court's finding that there was an implied oral contract governing the work at issue. It contends, instead, that because the implied contract did not contain a price for the work, the court should have supplied that missing term and allowed Superior to recover a reasonable sum for its services. Superior is correct that if an implied contract for services contains no term for remuneration, the plaintiff is ordinarily compensated at a price determined by the court. *See id.*; *Dubois Constr. Co. v. Moncla Constr. Co.*, 907

So. 2d 855, 857 (La. Ct. App. 2005) ("Where an agreement exists but the price to be paid is not stated, the court in the context of contractual interpretation must supply the missing price.")

Here, however, the district court did make a finding about the price and concluded that the parties intended Superior's compensation to be zero. This finding was not clearly erroneous. *See Gebreyesus v. F.C. Schaffer & Assocs., Inc.*, 204 F.3d 639, 642 (5th Cir. 2000) ("Where a court determines that ambiguity exists and makes factual determinations of intent, we review those factual findings for clear error."). The district court reasoned that Superior's general manager, Andy Gardner, testified that Superior did not intend to bill Lonestar for the work and subsequently sought payment only when Lonestar failed to pay the Turnkey price. The court noted that Lonestar personnel observed Superior performing the additional work and did not object, thereby consenting to it under the presumed belief that the work was being done as a business accommodation. Superior asserts that there was never an agreement to do the work without compensation and that Lonestar understood it would have to pay for the work because Berisford testified that he knew Superior "don't do nothing for nothing." But, as noted by the district court, Superior's CFO, George Tannehill, testified at the hearing on the motion to vacate the arrest of the barges that Superior had intended to perform the work as a concession. He also testified that this was discussed between Superior's Rodney Verret and Lonestar's Chief Idisi. In light of this testimony, Superior fails to show that the district court's finding was clearly erroneous. *See Lyondell Chem. Co. v. Occidental Chem. Corp.*, 608 F.3d 284, 301 (5th Cir. 2010) ("A finding of fact is not clearly erroneous 'if it is plausible in the light of the record read as a whole." (internal quotation marks and citation omitted)).

No. 12-30904

B.

Superior next argues that the district court incorrectly denied its claim for reimbursement for the premiums it paid to obtain builder's risk insurance on the barges. The Refurbishment Agreements required that the barges be insured during the course of construction and that the insurance be "at the expense of Owner." Although Superior alleged that it obtained an insurance policy at a cost of $216,000, Lonestar refused to reimburse Superior for this amount because it asserted that it had its own policy. The district court denied Superior's claim, reasoning that Superior failed to show that the policy Lonestar had obtained was insufficient, and that Superior also failed to introduce copies of the policies. The court further reasoned that the insurance was meant to benefit Lonestar, and therefore Lonestar could waive that condition of the contract.

The contract arguably required Superior to obtain a builder's risk policy at Lonestar's expense because it used the word "also" when referring to Superior's additional obligation to obtain insurance for employer's liability and worker's compensation, although that policy was to be at its own expense. *See* LA. CIV. CODE art 2050 ("Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole."). But even assuming that is so, the contract required a policy that fully insured the barges, that covered specified risks, and that expressly named Lonestar. As noted by the district court, Superior never offered the policy to show what insurance it had obtained. Because Superior did not produce the policy or prove the terms of its coverage, we cannot fault the district court for denying the recovery.

C.

Superior also argues that the district court erred by not awarding it costs incurred for work that Lonestar requested to clean the tanks of each barge. Lonestar approved and paid for the amount Superior estimated as the cost for

14

No. 12-30904

tank cleaning but refused to pay an additional amount that Superior claimed was necessary because the job required more actual work than originally estimated.  The only admissible evidence of the additional cost was the testimony of Superior's general manager, who testified that he could not recall the details of the claimed extra work.  The district court specifically discredited the testimony.  Superior does not address the basis for the district court's denial of the cost, and we otherwise see no reason to disturb the court's decision on this issue.  *See Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 375 (5th Cir. 2000) ("The burden of showing that the findings of the district court are clearly erroneous is heavier if the credibility of witnesses is a factor in the trial court's decision." (internal quotation marks and citation omitted)); *see also Brinkmann v. Dallas County Deputy Sheriff Abner*, 813 F.2d 744, 748 (5th Cir. 1987) (failure to challenge the basis for the district court's decision is same as abandoning arguments regarding that ruling).

### D.

Superior next argues that it should have been permitted to recover costs that it paid on Lonestar's behalf for the living and incidental expenses of Lonestar employees who were on the job site in Louisiana.  These expenses, amounting to $743,081.61, included money for the employees' cell phones, lodging at hotels, meals, plane tickets to fly to and from New Iberia, and petty cash for incidental expenses connected to the operation.  The district court held that costs associated with the living expenses were not "necessaries" within the meaning of the Federal Maritime Lien Act and could not be recovered.

Pursuant to the Federal Maritime Lien Act, "a person providing necessaries to a vessel" may assert a lien against the vessel and sue *in rem* to enforce the lien.  46 U.S.C. § 31342(a).  The term "necessaries" is given "a broad meaning."  *J. Ray McDermott & Co. v. Off-Shore Menhaden Co.*, 262 F.2d 523, 525 (5th Cir. 1959).  It includes "most goods or services that are useful to the

15

vessel, keep her out of danger, and enable her to perform her particular function. Necessaries are the things that a prudent owner would provide to enable a ship to perform well the functions for which she has been engaged." *Equilease Corp. v. M/V SAMPSON*, 793 F.2d 598, 603 (5th Cir. 1986) (en banc). By statute, necessaries include repairs and supplies, 46 U.S.C. § 31301(4), and they may come in the form of "money, labor and skill, and personal services as well as materials." *Equilease*, 793 F.2d at 603. It is the "want of the vessel, not the character of the thing supplied, which makes it a necessary." *Id.* (internal quotation marks and citation omitted); *see, e.g.*, *Sasportes v. M/V SOL DE COPACABANA*, 581 F.2d 1204, 1210 (5th Cir. 1978) (noting that advances made for "telephone calls, hotel rooms and similar items" may or may not be necessaries, and remanding for further findings by the district court).

The district court here reasoned that the living expenses of the Lonestar employees for which Superior provided payment were not necessaries because there was no showing that the employees were actively engaged in repair or refurbishment work, nor was their presence reasonably needed for the repair or refurbishment of the barges. We agree with the district court.

The evidence of the work done by the Lonestar employees on the site is sparse. According to the trial testimony, the employees on the site included mechanics, barge engineers, and electricians, but there are no details about these employees. Lonnie Barkaskas, Lonestar's chief mechanic, testified that his job was to ensure that the work was completed according to Lonestar's requirements. In other words, it appears that he monitored Superior's work to protect the interests of Lonestar. Barkaskas also testified that he and other employees went on board the barges daily, but he provided no further detail about their work. It is true, as noted above, that necessaries are generally given a broad interpretation. *J. Ray McDermott & Co.*, 262 F.2d at 525. But it is also true that "[m]aritime liens are *stricti juris* and will not be extended by

16

construction, analogy, or inference." *Racal Survey U.S.A., Inc. v. M/V COUNT FLEET*, 231 F.3d 183, 192 (5th Cir. 2000). The work of the Lonestar employees might have contributed to the refurbishment operation, but we conclude that the evidence here is insufficient to show that the advances for these employees' living expenses were necessary in order for the repairs and refurbishment of the barges to take place. Therefore, we find no error in the district court's disallowance of this claim.

### E.

Finally, Superior challenges the district court's calculation of prejudgment interest, arguing that the interest rate should have been higher and that interest should have begun running from the date of loss rather than from the date of judicial demand. The setting of prejudgment interest rates is committed to the broad discretion of the district court, which "may look to state law or other reasonable guideposts indicating a fair level of compensation." *Marine Overseas Servs., Inc. v. Crossocean Shipping Co.*, 791 F.2d 1227, 1236 (5th Cir. 1986) (internal quotation marks and citation omitted). The district court here acted well within its discretion by ordering a rate established pursuant to 28 U.S.C. § 1961. *See Reeled Tubing, Inc. v. M/V CHAD G*, 794 F.2d 1026, 1029 (5th Cir. 1986). Although interest generally runs from the date of loss, the district court also acted within its discretion by ordering interest from the date of judicial demand based on its findings that Superior delayed in filing the suit, that the amount awarded was less than the amount initially claimed, and that the sums awarded were due at varying times, making the precise date of loss difficult if not impossible to determine. *See id.*; *Howell v. Marmpegaso Compania Naviera, S.A.*, 578 F.2d 86, 87 (5th Cir. 1978).

### V.

We conclude that the district court did not err in its construction of the Turnkey contract or in awarding the credit to Lonestar. We also conclude that

No. 12-30904

the court did not err in its determination of the amounts recoverable by Superior.

AFFIRMED.